[Cite as *State v. Azali*, 2023-Ohio-4643.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,              :          No. 112299

v.                                      :

OMNISUN AZALI,                          :

    Defendant-Appellant.             :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 21, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-660200-A

---

### *Appearances:*

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and C. Richley Raley, Jr., and Heaven R. DiMartino, Special Assistant Prosecuting Attorneys, *for appellee.*

Flowers & Grube and Louis E. Grube, *for appellant.*

PER CURIAM:

{¶ 1} Defendant-appellant, Omnisun Azali ("Azali"), appeals the judgment of the Cuyahoga County Court of Common Pleas, alleging: (1) that his conviction is not supported by sufficient evidence; (2) that the trial court erred by denying his

motion to dismiss; (3) that the trial court erred in finding a child-witness competent to testify; and (4) that the trial court erred by permitting the State's expert witness to testify about the "ultimate issue" in this case. For the reasons set forth below, the judgment of the trial court is affirmed.

*Background*

{¶ 2} On May 26, 2021, Azali shot his wife Mwaka three times with a .40 Glock pistol and killed her. Mwaka was shot in the back of her head in the "right posterior parietal/occipital area," she was shot behind her right ear, and she was shot in the right cheek. State's Ex. 25. One of the shots to the back of Mwaka's head was fired from between six inches and two feet away. The shot to Mwaka's right cheek was a "contact" wound with a muzzle impression and soot at the entrance, meaning the barrel of the gun was "up against the skin" at the time the firearm was discharged. Tr. at 1197.

{¶ 3} Azali claimed that he killed his wife in self-defense. He claimed that during an argument in the couple's "family room," Mwaka picked up a nearby .380 firearm and they fought over it. Azali claimed that Mwaka fired three bullets while the two struggled over the firearm. He claimed that he eventually wrestled the .380 away from her and he heard the firearm hit the ground. Azali claimed that he backed away to grab the .380, but he could not immediately find it. Azali claimed that when he saw Mwaka on the couch reaching for something and raising her arm toward him, he pulled the .40 Glock firearm he was carrying in his waistband, moved behind

Mwaka on the couch, shouted at her to stop, and then shot her three times, closing the distance between them as he was taught in the military.

{¶ 4} After he killed Mwaka, Azali drove his two children to his mother's residence, calling his mother on the way.[1] Azali's mother met him and the children at her residence and they spoke for less than nine minutes. Afterward, Azali's mother drove him back toward Azali's Euclid residence where the shooting occurred. Approximately halfway to the residence, Azali's mother called 911 on speaker phone, stating that there may have been someone in Azali's home who had been shot, though she was not sure. Azali's mother indicated that Mwaka and Azali were both shooting at each other and Azali may have shot Mwaka. Law enforcement officers responded to the Euclid home and ultimately arrested Azali.

{¶ 5} As a result of the May 26, 2021 homicide, Azali was indicted for Aggravated Murder in violation of R.C. 2903.01(A), an unclassified felony (Count 1), Murder in violation of R.C. 2903.02(A), an unclassified felony (Count 2), Murder in violation of R.C. 2903.02(B), an unclassified felony (Count 3), Felonious Assault in violation of R.C. 2903.11(A)(1), a second degree felony (Count 4), Felonious Assault in violation of R.C. 2903.11(A)(2), a second degree felony (Count 5), Domestic Violence in violation of R.C. 2919.25(A), a first degree misdemeanor (Count 6), Endangering Children in violation of R.C. 2919.22(A), a first degree misdemeanor (Count 7), and Endangering Children in violation of R.C. 2919.22(A), a first degree

---

[1] As will be discussed, *infra*, the exact location of the children at the time of the shooting is in dispute.

misdemeanor (Count 8).[2]   Three-year firearm specifications pursuant to R.C. 2941.145(A) were attached to Counts 1-5 of the indictment.  Azali pled not guilty to the charges and, in addition, filed a "notice of self-defense" pursuant to Crim.R. 12.2 indicating that he intended to offer evidence supporting a claim of self-defense.

{¶ 6}   A jury trial was held on the charges against Azali from November 28, 2022 to December 7, 2022.   The State presented the testimony of numerous witnesses, including Azali's two children.  Azali presented expert testimony and also testified on his own behalf.  The state then presented an expert witness in rebuttal, closing the evidence.  Prior to the case being submitted to the jury, the trial court granted Crim.R. 29 motions for acquittal on the Endangering Children charges (Counts 7 and 8).  Of the remaining charges, Azali was acquitted of Aggravated Murder (Count 1), and he was convicted of all the remaining charges (Counts 2-6).

{¶ 7}   On December 14, 2022, a sentencing hearing was held.  The trial court determined that Counts 2-6 merged for purposes of sentencing, and the State elected to proceed to sentencing on Count 2, Murder, with the firearm specifications on Counts 2 and 3 being imposed in accordance with *State v. Bollar*, 171 Ohio St.3d 678, 2022-Ohio-4370, 220 N.E.3d 690.  Azali was then sentenced to serve an aggregate prison term of 21 years to life.  A judgment entry memorializing his sentence was filed December 16, 2022.  It is from this judgment that he appeals, asserting the following four assignments of error for our review:

---

[2] The indictment was filed June 3, 2021.

**First Assignment of Error**

**The trial court erred by denying defendant Omnisun Azali's Crim.R. 29(A) motion for judgment of acquittal on all charges.**

**Second Assignment of Error**

**The trial court erred by denying defendant Omnisun Azali's pretrial motion to dismiss, which was the only adequate remedy for the State's *Brady* violation.**

**Third Assignment of Error**

**The trial court committed error and plain error by qualifying V.A. as competent and permitting his testimony.**

**Fourth Assignment of Error**

**The trial court erred by permitting the State's expert witness, Kevin R. Davis, to offer an opinion on the ultimate issue of the reasonableness of specific instances of deadly force.**

For ease of discussion, we elect to address the assignments of error out of the order in which they were raised.

*Third Assignment of Error*

{¶ 8} In his third assignment of error, Azali argues that the trial court erred by finding that his son, V., was competent to testify as a witness in this case.

Standard Of Review

{¶ 9} Generally, a trial court's competency determination is reviewed on appeal under an abuse of discretion standard. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 100, citing *State v. Frazier*, 61 Ohio St.3d 247, 574 N.E.2d 483 (1991). An abuse of discretion constitutes conduct that is unreasonable,

arbitrary, or unconscionable. *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, 97 N.E.3d 474, ¶ 12.

{¶ 10} However, the parties both indicate that Azali failed to specifically object to V.'s competency to testify; thus, we must review this argument under the plain error standard pursuant to Crim.R. 52(B). Plain error requires an error or "deviation" from a legal rule that is an obvious defect in the trial proceedings and it must have affected a defendant's substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E. 2d 1240 (2002). For plain error to have affected substantial rights, "the trial court's error must have affected the outcome of the trial." *Id.* Importantly, notice of plain error is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

### Legal Standard

{¶ 11} Evidence Rule 601 states that "[e]very person is competent to be a witness except as otherwise provided in these rules." Although prior versions of the rule contained a provision expressly dealing with children under ten years old, the current rule does not. *State v. Haywood*, 7th Dist. Columbiana No. 21 CO 0035, 2023-Ohio-1121, ¶ 21.

{¶ 12} Nevertheless, R.C. 2317.01 states: "All persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Because of this, the

Supreme Court of Ohio has held that a "trial court must conduct a voir dire examination of a child under ten years of age to determine the child's competence to testify." *State v. Maxwell*, *supra*, at ¶ 100.

{¶ 13} In making its competency determination, the Supreme Court of Ohio has directed trial courts to consider the following factors: (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify; (2) the child's ability to recollect those impressions or observations; (3) the child's ability to communicate what was observed; (4) the child's understanding of truth and falsity; and (5) the child's appreciation of his or her responsibility to be truthful. *Id.*, citing *State v. Frazier*, *supra*, at 251. Importantly, the competency review refers to the time of trial rather than the time of the crime or the subject matter of the testimony. *State v. Clark*, 71 Ohio St.3d 466, 470-71, 644 N.E.2d 331 (1994).

Legal Analysis

{¶ 14} Azali and Mwaka had two children together who lived with them in their Euclid home: a daughter, S., who was nine years old at the time of trial, and a son, V., who was one month shy of his ninth birthday at the time of trial. Both children were at home during the May 26, 2021, shooting, and they were initially interviewed regarding the incident on June 3, 2021.

{¶ 15} At trial, the state sought to present the testimony of both children. Azali's assignment of error challenges the trial court's determination that the younger child, V., was competent to testify. In order to evaluate Azali's challenge,

we must review V.'s competency evaluation, which was conducted *in camera* by the

trial court.  The following transcript excerpt constitutes V.'s competency evaluation.

Q. [Trial Judge] Do you know why you are here today?

A. [V.] Because you are going to talk about my loved one.

Q. Yes. You are going to be asked questions about what you can remember that day when your mom passed away. And do you know the difference between telling the truth and telling a lie?

A. (Nodding.)

Q. Tell me what's the difference.

A. The truth is like when they ask you if you ate something and you ate something, you have to say yes, I did eat something. And a lie is when like if you asked me did I build that and I would say no, that's a lie because I did make it.

Q. That's good. What grade are you in?

A. Third.

Q. Third. And where did you go to school?

A. Shady Lane.

Q. And what city is that in?

A. Columbus.

Q. Okay. And who do you live with there?

A. My cousin.

Q. What's your cousin's name?

A. Hagar.

Q. Are you a little bit nervous about being here today?

A. A little bit, yeah.

Q. And you can be honest with me. Can you tell me one of the reasons maybe you're a little bit nervous?

A. Because I heard that my dad might be here.

Q. Yeah, he will be here. He won't question you. So you said you are a little bit nervous because your dad is going to be here; is that right?

A. Yes.

Q. You're nervous because your dad is here. And he will be here for your testimony, although he won't talk to you. Do you have any fears in terms of your dad if you testify? Can you tell me?

A. Like what type of fears?

Q. Well, I don't know. I mean, the fact that he is here and it's a trial, is that going to make it more difficult for you to tell the truth?

A. It's going to be scary.

Q. It could be scary. When you take an oath or a promise that you tell the truth, do you know what that means?

A. Yes.

Q. What does it mean?

A. They swear you in.

Q. They swear you in, that's right. And then you promise to tell the truth?

A. And nothing but the truth.

Q. And nothing but the truth. Are you going to be able to do that?

A. (Nodding.)

Q. Is that yes? Even in front of your dad are you going to be able to tell the truth?

A. Yeah.

Q. Okay. I know this isn't easy for you. And you have learned the difference between right and wrong from – have you learned the difference between right and wrong?

A. I don't know. I just knew it. Because of homeschool.

Q. They teach you those kind of things at the homeschool. But you go to Shady Lane, is it?

A. Yeah.

Q. What's your favorite subject in school?

A. Math.

Q. All right. Do you have any questions you want to ask me?

A. Is there going to be anyone else besides dad?

Q. Yeah. I'm sorry. There's a jury there. There's 12 people and they listen to the evidence. You're just – you and your sister are just two of the witnesses. There's going to be like 20 witnesses. So you're just the two of you, but there's going to be a lot more witnesses who are called.
        So yes, the jury will be in the jury box. There might be some people in the back of the courtroom because sometimes people, they have nothing else to do so they come and watch cases. But anyway. So, yeah, there will be other people in the courtroom. How does that make you feel?

A. Scared.

Q. Scared, yeah. Even though you are scared do you think you will still be able to tell the truth about what happened, what you can remember happening on that day that your mom died?

A. (Nodding.)

Q. You will get through this. You are a bright kid here. All right. We will try to make it as comfortable as we can for you. And does it help you to have Avery [dog] sit with you near the witness stand?

A. (Nodding.)

Q. I will let you have Avery. And you want to take that too? Sure. Absolutely. I think that's great. All right. Honey, we are going to go back out and I will talk to the attorneys and then we are going to get your testimony and then hopefully we can get you on your way back to Columbus. Okay?

A. I don't want to go back to Columbus.

Q. You don't?

A. I want to go to a park.

Q. Oh, one other thing. Can you tell us your name?

A. My name is V[.]

Q. How do you spell V[.]?

A. V[.]

Q. And your last name is?

A. [last name provided].

Tr. at 478-482.

{¶ 16} Notably, defense counsel was not permitted to be present during the *in camera* competency evaluations of the children; however, Azali was promptly provided transcripts of the evaluations. Upon acquiring the transcripts, Azali specifically objected to S.'s testimony, *the daughter*, claiming that all of the appropriate factors for competency had not been demonstrated during her evaluation. The trial court overruled Azali's objection and the children were

permitted to testify.  Azali did not make a clear objection to V.'s testimony at that time.[3]  Nevertheless, he argues on appeal that V. did not demonstrate he was competent to testify.

{¶ 17}  A review of the transcript from V.'s competency determination shows that V. demonstrated an understanding of truth and falsity and that he had an appreciation of his responsibility to be truthful.  He also testified that he understood he was there to testify about his "loved one."  Tr. at 478.  Further, V. was able to name who he lived with, where he lived, and he was aware that he would be testifying in front of his father.  A trial court could properly determine that based on V.'s answers he had the ability to communicate what was observed.

{¶ 18}  The trial court indicated it did not specifically delve into exactly what the children remembered regarding the shooting itself because "[i]t's not this Court's prerogative to cross-examine [the children] about what exactly [they] remember. It is only about her ability to receive and his, the son, receive accurate impressions of fact. * * * They know where they were at.  They knew why they were here."  Tr. at 540.  Thus the trial court covered V.'s ability to receive accurate impressions of fact and to recollect impressions or observations, albeit not those of the incident in question.

---

[3] We note that as soon as V. was called to testify, the trial court again asked V. some preliminary questions such as his age, where he went to school, what grade he was in, what his favorite subject was, and where he lived.  He was also asked in front of the jury if he knew the difference between telling the truth and a lie, and if he knew why he was testifying.  To the last question, V. responded, "Because of our mom."  Tr. at 551.  V. indicated that he was nervous because a lot of people were in the courtroom, then the trial court permitted the State to proceed to direct examination.

{¶ 19} Given that there was no specific objection to V.'s competency, we do not find plain error here as he clearly understood his responsibility and the parties were free to question him regarding his specific memories related to the incident. In making this finding, we note that the Supreme Court of Ohio has found no reversible error in finding child-witnesses competent who were *significantly* younger than V. at the time of trial. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 101 (child was five years old when she testified); *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239 (child was six years old when he testified); *State v. Allard*, 75 Ohio St.3d 482, 663 N.E.2d 1277 (1996), (child was five years old at the time he testified).

{¶ 20} Finally, we emphasize that even if we were to construe Azali's objections to S.'s competency and his objections to not being permitted to be present during the *in camera* competency evaluations as objections to V.'s competency to testify, which would place us under abuse of discretion review, we could find no reversible error here. Again, V. demonstrated his understanding of the truth, his responsibility to tell the truth, he was able to recount issues from his life when asked, and he understood why he was present. Under an abuse of discretion review, we find nothing arbitrary, unreasonable, or unconscionable in determining that V. was competent to testify. Any inconsistencies in his testimony were for the jury to evaluate.[4] For these reasons, Azali's second assignment of error is overruled.

---

[4] We note that defense counsel sought and received a jury instruction that one of the things stated by V. in his testimony was not true.

## First Assignment of Error

{¶ 21} In his first assignment of error, Azali contends that the trial court erred by denying his Crim.R. 29 motion for a judgment of acquittal. Specifically, he contends that the state failed to establish beyond a reasonable doubt that he was not acting in self-defense when he killed Mwaka.

## Standard of Review

{¶ 22} "A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence." *State v. Johnson*, 8th Dist. Cuyahoga No. 111618, 2023-Ohio-1367, ¶ 118. A sufficiency analysis examines whether a party has carried the burden of production at trial. *Id.* at ¶ 119. However, the arguments under this assignment of error seek to establish that the State failed to carry the burden of establishing that Azali did not act in self-defense. On the affirmative defense of self-defense, Ohio law assigns the burden of production to the defendant and assigns the burden of persuasion to the prosecution. *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 19; *State v. Giglio*, 8th Dist. Cuyahoga No. 112001, 2023-Ohio-2178, ¶ 16. The burden of persuasion on self-defense, unlike the burden of production, is subject to the manifest weight standard of review on appeal. *Id.* at ¶ 26. Since each of Azali's arguments herein assert that the State failed to carry its burden of persuasion on self-defense, we apply the manifest weight standard to this challenge.[5]

---

[5] At oral argument, Azali suggested that *Messenger* rejected sufficiency of the evidence as the appropriate appellate standard of review for self-defense arguments under a Fifth Amendment/Due Process challenge, but *Messenger* did not address any

{¶ 23} When reviewing a manifest weight challenge, a court reviews the entire record, weighing all evidence and reasonable inferences and considering the credibility of the witnesses, to determine whether the trier-of-fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In this analysis, the appellate court functions as a "thirteenth juror" and may disagree with the factfinder's resolution of conflicting testimony. *Id.*

{¶ 24} Nevertheless, the trier-of-fact "is in the best position to observe the witnesses' demeanor, voice inflection, and mannerisms in determining each witness's credibility." *State v. Hughes*, 8th Dist. Cuyahoga No. 81768, 2003-Ohio-2307, ¶ 26. For this reason, in reviewing criminal manifest-weight-of-the-evidence challenges, appellate courts must be mindful of the presumption in favor of the finder of fact and defer to the factfinder's resolution of conflicting testimony if the greater amount of credible evidence supports the verdict. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25; *State v. Bell*, 8th Dist. Cuyahoga No. 110693, 2022-Ohio-823, ¶ 12. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175,

---

arguments under a Sixth Amendment challenge. However, *Messenger* is clear that an affirmative defense is not an essential element of a crime; rather, it is an affirmative defense. *Messenger* at ¶ 24; *See State v. Smith*, 8th Dist. Cuyahoga No. 111593, 2023-Ohio-1296, ¶ 44. As Azali carried the burden of *production*, and the State carried the burden of *persuasion* on self-defense, a manifest weight review is appropriate for an issue that is not an essential element of a crime, regardless of how the challenge is characterized.

485 N.E.2d 717, 718 (1st.Dist.1983); *State v. May*, 2015-Ohio-4275, 49 N.E.3d 736, ¶ 26 (8th Dist.).

Legal Standard Governing Self-Defense

{¶ 25} "Under Ohio law, a person is permitted to act in self-defense." *State v. Williams*, 8th Dist. Cuyahoga No. 111620, 2023-Ohio-1903, ¶ 29. Revised Code 2901.05(B)(1) describes the process of raising this affirmative defense at trial and reads, in its relevant part, as follows:

> If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *.

R.C. 2901.05(B)(1).

{¶ 26} "Under R.C. 2901.05(B)(1) there are two burdens." *State v. Davidson-Dixon*, 2021-Ohio-1485, 170 N.E.3d 557, ¶ 18 (8th Dist.). "The defendant has the initial burden of production, which is the burden of producing evidence that 'tends to support' that the defendant used the force in self-defense." *Id.*, quoting R.C. 2901.05(B)(1); *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 21 (indicating that self-defense is still an affirmative defense and the burden of production is still on the defendant).

> If the defendant meets his or her initial burden of producing evidence tending to support a claim of self-defense, the burden then shifts to the state to establish its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use force in self-defense.

*State v. Ratliff*, 8th Dist. Cuyahoga No. 111874, 2023-Ohio-1970, ¶ 26. Under this burden shifting framework, a defendant who has employed the use of deadly force must produce evidence that tends to establish that

> he or she (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger.

*Id.* at ¶ 27, citing *Messenger* at ¶ 14. "To satisfy this burden of proving beyond a reasonable doubt that the defendant did not use force in self-defense, the state must disprove at least one of the elements of self-defense." *Id.*

{¶ 27} "The first * * * [element] of the self-defense test—whether the defendant was at fault in creating the situation giving rise to the affray—asks, in essence, whether the defendant was the initial aggressor." *State v. Gardner*, 8th Dist. Cuyahoga No. 110606, 2022-Ohio-381, ¶ 25. "'This concept is broader than simply not being the immediate aggressor. A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense.'" *State v. Gaston*, 8th Dist. Cuyahoga No. 98904, 2013-Ohio-2331, ¶ 16, quoting *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002-Ohio-415.

{¶ 28} "[T]he second element of self-defense involves both objective and subjective considerations." *State v. Hughkeith*, 2023-Ohio-1217, 212 N.E.3d 1147, ¶ 56 (8th Dist.). A defendant's belief that he was in immediate danger of death or great bodily harm must be objectively reasonable, and the defendant must have an honest belief that he was in such imminent danger. *Id.* "'[I]f the objective standard

is met, the jury must determine if, subjectively, this particular defendant had an honest belief that she was in imminent danger.'" *Id.*, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997).

{¶ 29} "'Implicit in th[e] second element of self-defense, i.e., that the defendant's use of deadly force was in 'good faith,' is the requirement that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *State v. Ratliff, supra*, at ¶ 31, quoting *State v. Hendrickson*, 4th Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 31. "Accordingly, this court has held that the force used to defend must be at once objectively reasonable and necessary under the facts and circumstances of the case." *Id.*, citing *State v. Johnson*, 8th Dist. Cuyahoga No. 110673, 2022-Ohio-2577, ¶ 15. If the amount of force used is so disproportionate that it shows an "unreasonable purpose to injure" the defense of self-defense is unavailable. *State v. Reyes-Figueroa*, 2020-Ohio-4460, 158 N.E.3d 939, ¶ 27 (8th Dist.).

Evidence Presented[6]

{¶ 30} Azali lived in Euclid, Ohio, with his wife Mwaka and their two children. On May 26, 2021, Azali finished working remotely in his home office at 3 p.m. He intended to take his son, V., to a 4 p.m. appointment with an acupuncturist.

---

[6] We note that in such a voluminous trial, it is impractical to summarize every piece of potentially relevant evidence. Failure to mention any specific piece of evidence does not mean it has been omitted from consideration. We have reviewed the record in its entirety.

{¶ 31} Between 3 p.m. and 4 p.m., Azali got into an argument with Mwaka. The argument culminated in Azali shooting Mwaka three times in the head on their family room couch with a .40 caliber Glock pistol. Two of the shots went into the back of Mwaka's head, near her right ear. Of those two shots, one was fired from between six inches and two feet from Mwaka's head. A bullet actually passed through Mwaka's head and imbedded a braid from Mwaka's hair 2-3 inches into a cushion. The third shot was a contact wound to Mwaka's cheek, meaning that the .40 caliber Glock was held right against Mwaka's face.

{¶ 32} Azali claimed that he only shot Mwaka after she had already fired three shots in the family room with her .380 Ruger pistol, albeit while Mwaka and Azali were struggling over the weapon, and Azali claimed he was sure she was going to fire specifically at him and kill him. Tr. at 1619. Evidence indicated that bullets had been fired in the family room from a .380 Ruger pistol in a direction more generally toward the front of the house than toward the back yard. One bullet from the .380 hit a lamp and ricocheted into a wall. There were other bullet holes found caused by the .380 — one in the shelf of the interior of a closet and one in the interior of the wall itself. *Id.* at 668. DNA consistent with Mwaka's was found on the .380, including on the trigger.[7] Mwaka also had gunshot residue ("GSR") on her hands.

{¶ 33} Azali and Mwaka's two children were home at the time the shooting occurred and they testified at trial. The daughter, S., who was eight years old at the

---

[7] DNA consistent with Azali's was also found on the .380.

time of the shooting, testified that prior to the shooting her parents were angry and yelling at each other. She testified that she saw her father with a firearm but she did not see her mother with a firearm; however, she testified that it was possible her mother could have had a firearm. S. testified that her and her younger brother V. were outside during the incident, and that she only heard one gunshot.

{¶ 34} Azali's son, V., who was seven years old at the time of the shooting, also recalled his parents arguing before the shooting. He testified that he saw Azali with a pistol in his hand and he did not see his mother with a gun. Tr. at 556. V. testified that he saw Azali point a gun at his mother but he did not see his mother point a gun at his father. V. testified that he heard a shot and that he ran outside. V. testified that shortly thereafter Azali took him and his sister to his grandmother's residence.

{¶ 35} On cross-examination, V. was asked about prior stories he had told about the date in question. V. acknowledged that he had previously told his grandmother that he was "outside" during the shooting and that he did not see anything but he heard a shot from outside. Tr. at 577-78. V. also testified that he remembered telling somebody else that he did not see anything because he was in the garage. V. testified it was possible he heard a shot but did not see what happened. *Id.* at 580.

{¶ 36} On re-direct, V. testified that he saw Azali get a firearm from his bedroom prior to the shooting. He also testified that he followed his sister outside, and when he was asked if a shot scared him into running outside he testified "[k]ind

of." Tr. at 581. V. testified that he only recalled hearing one shot. He testified that he did not recall telling his uncle that he saw his Mwaka with a gun. However, V.'s uncle testified at trial that V. told him on the day after the incident that V. saw his "mommy" shooting at "daddy." Tr. at 1376.

{¶ 37} The evidence established that after the shooting, Azali took his children to his mother's residence, calling his mother on the way so she would meet him there. Azali and his mother spoke privately at her residence for under nine minutes, then Azali's mother drove him back to the Euclid residence in her car. Approximately halfway back to Azali's residence, Azali's mother called 911 on speakerphone.

{¶ 38} The 911 call was played for the jury. On the call, the dispatcher asked for the address of the emergency and Azali provided the address when prompted by his mother. The dispatcher then asked, "what's going on?" State's Ex. 15. Azali's mother responded that there may be a person who was wounded at the given Euclid address. She stated there may have been some shots fired. The dispatcher asked how she knew someone was wounded and Azali's mother stated that she had somebody with her who said he may have shot somebody at the address. Azali's mother stated that she needed EMS, that she did not know if Mwaka was hit, that she may not be, and that Mwaka may have already called for help herself but Azali's mother did not know anything. The dispatcher asked for a phone number of the residence to call and Azali provided Mwaka's phone number to the dispatcher.

Azali's mother stated that Azali was not sure whether he shot Mwaka and that they were both shooting at each other.

{¶ 39} Azali's mother testified at trial that on the date of the incident Azali was inconsolable and she did not get much information from him prior to calling 911. She testified that she did not actually know what happened when she called 911 other than that Azali indicated that he and Mwaka were shooting at each other and Mwaka had been struck.

{¶ 40} As a result of the 911 call, law enforcement was dispatched to Azali's residence and Mwaka was found deceased. An investigation ensued, which included DNA analysis of both weapons, GSR tests, an analysis of shot trajectories of the bullets fired from both weapons, and searches of the residence. All of this was presented to the jury.[8]

{¶ 41} Azali provided his own version of events at trial in order to establish his self-defense claim. Azali gave a detailed narrative of his past, including meeting Mwaka, getting married, and having two children with her. He testified that in the months and years prior to May 26, 2021, Mwaka was growing increasingly worried with the social unrest in the community, so she acquired a firearm. Azali testified that Mwaka would absentmindedly leave her firearm around the house even while the children were present.

_____

[8] The State also presented evidence of violent drawings that Azali had made showing a person getting shot in the head, but Azali explained that these were part of art therapy that he had made to deal with things he had seen in the military. In fact, some of the art he created mimicked styles of his favorite artist.

{¶ 42} As to the events of May 26, 2021, Azali testified that when he got off of work at 3 p.m., he told his son to get ready for his acupuncture appointment. At that time Mwaka was on the phone speaking her native language to relatives in Africa. Azali testified that he thought Mwaka sounded angry on the call, but Mwaka's sister testified that Mwaka was not angry that day. Regardless, while Mwaka was on the phone, Azali testified that he went to his room and put his .40 Glock in his waistband. He testified that he usually carried a firearm for protection and he intended to put the firearm in the vehicle's glove compartment.

{¶ 43} Once Mwaka's call ended, Azali testified that she chided V. for not being ready for his acupuncture appointment. Azali testified that he told Mwaka not to worry about it. According to Azali, Mwaka grew very angry at Azali for correcting her in front of the children.

{¶ 44} Azali testified that the children went to the backyard and an argument ensued between himself and Mwaka in the family room wherein Mwaka slapped him. Azali testified that he grabbed Mwaka by the arms and put her on the ottoman, thinking she would be apologetic for physically attacking him. However, Azali testified that unbeknownst to him, Mwaka "immediately turned to her left and grabbed the firearm that I did not see on this couch near the first cushion nearest the fireplace." Tr. at 1596.

{¶ 45} Azali testified that he reacted with his military training and closed the distance between himself and Mwaka, grabbing her forearm with one hand as she held the firearm. He testified that his other arm was wrapped around Mwaka's

waist. Azali testified he was trying to control her movement and deescalate the situation. He testified that the momentum took them toward the fireplace and Mwaka fired multiple shots. Azali testified that he was trying to stay away from the muzzle of the firearm, but he could not see it. Tr. at 1602. He testified that Mwaka fired another shot as he was picking her up, moving her toward the couch. Azali testified that his goal was to get the firearm out of Mwaka's hand to end the situation.

{¶ 46} Azali testified that as he was moving Mwaka toward the couch, he heard the firearm fall to the ground. He continued:

> As I'm throwing her to the corner of the couch, as I'm practically right on top of her, I look at her hands. The firearm is not there. I look at the couch. The firearm, the .380 is not there. I began to take a step back. * * * I began taking a step back toward that TV stand hoping to find the .380.
>
> * * *
>
> I thought it had fallen somewhere between the third shot, which was in the center of the room, and where it [sic] she is right now, the couch.

Tr. at 1613-1614.

{¶ 47} Azali testified that he looked for the firearm because he was not scared of Mwaka without the gun. Then, Azali testified:

> As I'm looking toward the base of the ottoman, my wife's now still sitting on the couch, reaches over, lunges over with her right arm and her right hand in between the couch and the ottoman into a space that I'm not able to see. I'm not able to visibly observe it from where I'm standing.
>
> * * *
>
> As she reached down to the ground, I immediately thought she had found this firearm. At that moment, I wasn't close enough to just lay on

her, to fall on her. I pulled my firearm. I'm near the center of the room with my back towards the TV stand. I pull my firearm and I begin to scream and shout at her.

* * *

I said Mwaka, stop; Mwaka, stop.

Tr. at 1615-17

{¶ 48} Azali testified he did not shoot Mwaka immediately; rather, he maneuvered behind her as she began to lift her arm, screaming for her to stop. Azali testified that he fired three shots at her in rapid succession with his left knee on the couch behind her. Tr. at 1620. Azali testified that he believed his wife was going to kill him, and he waited to fire until he was certain her gun was moving in his direction. Azali testified that as he fired he closed the distance with Mwaka as he was taught in the military. He testified that he closed the distance all the way to the point of contact.

{¶ 49} After the shooting Azali testified that he put Mwaka's .380 on the ottoman and threw his .40 on his bed. He testified that he then put the children in his vehicle and left the scene, thinking he would go to a police station but he wanted to take the children somewhere so he called his mother. He testified that after he left the children at his mother's house, he went back to the scene with his mother.

{¶ 50} Azali presented expert testimony regarding army training, indicating that soldiers were trained to close the distance in close-combat situations as quickly as possible until they were on top of the enemy and delivered an incapacitating shot.

Azali also presented evidence that he and his wife had gone to a local shooting range in 2019.

{¶ 51} On rebuttal, the State presented an expert on the use of force who opined that Mwaka was incapable of continuing to be a threat after the first bullet struck her in the head. The expert also testified that individuals are usually taught to shoot for the chest first then the head rather than all three shots in the head.

Legal Analysis

{¶ 52} Despite the significant length of the trial, a substantial portion of the evidence in this case is not in dispute, particularly the physical evidence. For example, there is no dispute that Azali shot and killed his wife. There is no dispute that Mwaka was shot in the back of the head, behind the right ear, and in the cheek. There is no dispute that the shot in the cheek was a contact wound. There is no dispute that a .380 firearm was found near Mwaka on an ottoman. There is no dispute that Mwaka's DNA was on the handle and trigger. There is no dispute that bullet holes were found in the wall of the room where Mwaka died that had been caused by the .380 firearm. There is no dispute that Mwaka had GSR on her hands. There is no dispute that the shooting took place between 3 and 4 p.m. on May 26, 2021, and there is no dispute that the couple's children were at home when the shooting occurred.

{¶ 53} The key disputes in this case are in how the physical evidence is interpreted and whether the story told by Azali was credible. There is also a dispute

about the children's testimony regarding the day in question, particularly V.'s, considering earlier stories he may have told to others such as his uncle.

{¶ 54} In reviewing the matter, we emphasize that although Azali's testimony detailed his life, his honorable military service, his education, his travel, his marriage, his children, and his work with veterans, the ultimate determination of his credibility rested with the jury, which was able to see and hear his testimony and evaluate whether his self-defense claim was valid. The trier-of-fact is free to believe *or disbelieve* the testimony of the witnesses, taking into account any inconsistencies in testimony along with the demeanor of the witnesses. *State v. Bentley*, 2023-Ohio-1792, 218 N.E.3d 989, ¶ 24 (11th Dist.); *State v. Scott*, 8th Dist. Cuyahoga No. 110744, 2022-Ohio-2768, ¶ 40.

{¶ 55} Here, there was some testimony undermining Azali's credibility. For instance, Azali testified that Mwaka was already angry on the phone when she was talking to her family, but Mwaka's sister testified that this was not true. Further, Azali's mother testified that Azali did not tell her he killed Mwaka even though he knew at the time that she was dead. A jury could reasonably find that Azali's actions after the homicide, and what he told his mother, were not indicative of someone acting in self-defense. In addition, both children testified at the time of trial that they saw Azali with a gun and not their mother, though there were admittedly some inconsistencies with the children's memories.

{¶ 56} Perhaps most importantly, however, was the physical evidence showing where and how Mwaka was shot. Mwaka was shot in the *back* of the head,

behind her right ear. One of the shots to Mwaka's head was fired from between six inches and two feet. Then, another shot was a *contact wound against Mwaka's face*. A jury could readily determine that due to the position of Mwaka's body, and due to how and where she was shot, Azali's story was simply not credible as to his belief of imminent harm.

{¶ 57} Moreover, a jury could readily discount Azali's claim that he had time to pull his firearm from his waistband, maneuver behind Mwaka on the couch, and shout at her to stop all before she raised her arm. The jury could have believed that Azali was not actually in danger for his life in that moment and that his use of force was not reasonable.

{¶ 58} In sum, after reviewing the record in its entirety, we do not find that the jury clearly lost its way or created a manifest miscarriage of justice by determining that Azali was not acting in self-defense beyond a reasonable doubt. It is well-settled that a conviction is not against the manifest weight of the evidence simply because the trier-of-fact rejected a defendant's version of events. *See State v. Hughkeith*, 2023-Ohio-1217, 212 N.E.3d 1147, ¶ 58 (8th Dist.). Therefore, Azali's first assignment of error is overruled.

*Second Assignment of Error*

{¶ 59} On November 23, 2021, Azali filed a motion to dismiss the charges against him, arguing that the state committed a *Brady* violation by failing to obtain Blink security camera footage of his backyard from its third-party custodian. Doc. 37. On appeal, he argues that the trial court erred by denying his motion to dismiss.

Standard of Review

{¶ 60} Appellate courts "review de novo a trial court's decision involving a motion to dismiss on the ground that the state failed to preserve exculpatory evidence." *State v. Newton*, 2018-Ohio-1392, 110 N.E.3d 816, ¶ 15 (8th Dist.). "A de novo standard of review affords no deference to the trial court's decision, and the appellate court independently reviews the record." *Cleveland v. Olivares*, 197 Ohio App.3d 78, 2011-Ohio-5271, 966 N.E.2d 285, ¶ 7 (8th Dist.).

Legal Standard for *Brady* Violations

{¶ 61} In *Brady v. Maryland* and its progeny, the United States Supreme Court has held that the Due Process Clauses of the United States Constitution place a duty on the state to disclose exculpatory or impeachment evidence that is material and favorable to the accused. *Brady v. Maryland*, 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A *Brady* violation consists of "three elements: (1) the prosecution failed to disclose the evidence upon request; (2) the evidence was favorable to the defense; and (3) the evidence was material." *State v. Newell*, 8th Dist. Cuyahoga No. 106584, 2019-Ohio-976, ¶ 37. "The defendant bears the burden of proving that a *Brady* violation rises to the level of a denial of due process." *State v. Lett*, 8th Dist. Cuyahoga No. 111350, 2023-Ohio-2580.

{¶ 62} As to the third element, "[e]vidence favorable to the defendant 'shall be deemed material only if there is a reasonable probability, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"

*State v. Glover*, 2016-Ohio-2833, 64 N.E.3d 442, ¶ 33 (8th Dist.), quoting *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Glover* at ¶ 33.

> It is simply not enough to show that the undisclosed evidence would have allowed the defense to weaken, or even to 'destroy,' * * * the particular prosecution witnesses or items of prosecution evidence to which the undisclosed evidence relates.

(Citation omitted.) *State v. Jackson*, 8th Dist. Cuyahoga No. 104782, 2017-Ohio-2659, ¶ 19, quoting *Kyles v. Whitley*, 514 U.S. 419, 460-461, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Further, "[t]he possibility that evidence could have exculpated the defendant if preserved or tested is not enough to satisfy the standard of constitutional materiality." *State v. Spencer*, 8th Dist. Cuyahoga No. 106881, 2018-Ohio-5351, ¶ 34.

{¶ 63} The state's failure to preserve material evidence that is favorable to the defense constitutes a due process violation "regardless of whether the state acted in good or bad faith." *Cleveland v. Townsend*, 8th Dist. Cuyahoga No. 99256, 2013-Ohio-5421, ¶ 21. However, where the evidence is not material "but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 10.

> "The term 'bad faith' generally implies something more than bad judgment or negligence." *State v. Tate*, 5th Dist. No. 07CA55, 2008-Ohio-3759, * * * ¶ 13. 'It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior

motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.' *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276, 452 N.E.2d 1315 (1983), quoting *Slater v. Motorists Mut. Ins. Co.*, 174 Ohio St. 148, 187 N.E.2d 45 (1962), paragraph two of the syllabus.

*State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 81.

{¶ 64} On appeal, the "standard of review for the materiality of a purported *Brady* violation is de novo because it presents a mixed question of law and fact." *State v. Sutton*, 8th Dist. Cuyahoga Nos. 108748 and 108750, 2021-Ohio-854, ¶ 61, quoting *United States v. Phillip*, 948 F.2d 241, 250 (6th Cir.1991). Thus, appellate courts will "defer to a trial court's factual findings on issues of credibility that are supported by the record." *Sutton* at ¶ 61.

Evidence Presented

{¶ 65} Before Mwaka's death, Azali installed a Blink security system, positioning video cameras on the outside of his house. Detective Phil Tschetter was part of the police investigation in this case and testified about the state's efforts to obtain this video footage from the possession of its third-party custodian, Amazon. He stated that, in accordance with the guidelines from the Cuyahoga County Prosecutor's Office, a preservation letter was mailed to Amazon via the Corporation Service Company on May 28, 2021. Tr. at 1123, 1127, 1142; Ex. 1.

{¶ 66} Detective Tschetter was unaware of when to expect an answer from Amazon as he had never before obtained recordings from a Blink security system. Tr. at 1124. However, he had previously waited up to several months for similar types of requests to be processed. *Id.* After receiving no response to the preservation

letter, another detective suggested that he try resubmitting the request using an online portal. *Id.* at 1125. Detective Tschetter followed this advice in January 2022. *Id.* at 1125-1126, 1143. Shortly thereafter, he was informed that Amazon does not generally retain recordings from Blink security systems for more than sixty days and that the requested video footage was no longer available. *Id.* at 1126, 1127, 1129.

{¶ 67} In the motion to dismiss, the defense pointed out that V. had told the police that he saw his father point a gun at his unarmed mother before he went into the backyard but had told his grandmother that he was in the backyard during the altercation. The defense argued that the charges should be dismissed as the state "failed to obtain the video recordings to corroborate the information" in V.'s story. Doc. No. 37. In response, the prosecution argued that the state had engaged in good faith efforts to obtain this footage. Tr. at 137. Neither party disputed that the security cameras were positioned to record what transpired in the backyard.[9] *Id.* at 1131.

{¶ 68} After hearing arguments from the parties, the trial court concluded that "there's no evidence that the State deliberately spoliated this evidence." Tr. at 141. The trial court also stated that the defense was, in its arguments, "just assuming it's [the video footage] going to be beneficial to the defendant which it may not be." Tr. at 141. The trial court then denied Azali's motion to dismiss. *Id.* at 142.

---

[9] At trial, the trial court asked the state if "there [was] some indication that the cameras were not even working[.]" Tr. at 1131. In response, the prosecution stated the following: "we knew the number of the back camera and you can only see whether or not it's been activated because we don't have video. And we couldn't find it activated in the key times so it appears it wasn't activated." *Id.*

Legal Analysis

{¶ 69} On appeal, Azali asserts that the deleted recordings were material evidence because "the video *would have shown* that V.[] was in the backyard * * * during his parents' deadly confrontation * * *." (Emphasis added). Appt.'s Br. at 26. However, belying the certainty of Azali's assertion is the fact that this video footage was never viewed before its deletion. *See State v. Durham*, 8th Dist. Cuyahoga No. 92681, 2010-Ohio-1416, ¶ 21. Since no one observed these recordings and no one can know what the security camera captured, neither party can establish that this evidence was favorable to its case. This video footage could have just as easily confirmed as refuted the story that V. told the police. *Durham*, at ¶ 21 (holding that a defendant could not establish a recording of the actual incident was materially exculpatory evidence where "no one viewed the videotape before it was erased * * *"); *State v. Arnett*, 2d Dist. Miami No. 2018-CA-3, 2018-Ohio-4227, ¶ 20; *Toledo v. Sanders*, 6th Dist. Lucas No. L-21-1260, 2023-Ohio-2092, ¶ 39.

{¶ 70} Since the contents of the lost video footage are unknown, Azali's assertion about the exculpatory nature of this evidence is speculative. "Courts have consistently rejected *Brady* claims that are too speculative, requiring defendants to substantiate claims that the evidence in question was favorable and material." *State v. McGuire*, 8th Dist. Cuyahoga No. 105732, 2018-Ohio-1390, ¶ 28. Azali has established only that a possibility exists that the deleted video footage was favorable to his defense. *Townsend*, *supra*, at ¶ 22, 25 (holding that the possibility that

evidence was exculpatory is not sufficient to meet the constitutional standard for materiality). Thus, Azali has only established that this video footage was potentially useful evidence.

{¶ 71} Since he has failed to establish that this footage was material evidence, Azali must demonstrate that the state acted in bad faith to establish a due process violation. However, on appeal, Azali does not raise any arguments to establish that the police acted with "dishonest purpose, moral obliquity, conscious[ness of] wrongdoing, * * * ulterior motive, or ill will * * *" in this case. *Hoskins, supra*, at 276.[10] Further, the record does not contain any indication that the police acted in bad faith. Detective Tschetter's testimony establishes that law enforcement sought to obtain this footage but that a third-party disposed of these recordings as a matter of course in accordance with its retention policy. Since Azali has not established that the state acted in bad faith, the loss of this video footage does not amount to a due process violation in this case.

{¶ 72} Beyond the failure to establish materiality or bad faith, the facts of this case present an additional reason to conclude that a due process violation did not occur in this situation. Under *Brady*, the State's duty to disclose material evidence "applies only to that evidence which is 'in its possession.'" *State v. Lawson*, 64 Ohio St.3d 336, 344, 595 N.E.2d 902, (1992), quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Where the state has no control

---

[10] During oral arguments, the appellant conceded that the evidence in this case contains no indication that the state acted in bad faith in the process of seeking to obtain this video footage.

over evidentiary materials, it "is incapable of suppressing them in violation of *Brady.*" *Lawson* at 344.

{¶ 73} In this case, no evidence suggests that a state agent or any entity affiliated with the prosecution ever had possession or control of these recordings. Further, no evidence suggests that the state deleted or otherwise facilitated the destruction of this video footage. Rather, the record establishes that a third-party had control over the video footage at issue and deleted this footage in accordance with its retention policy. The record also indicates that the state took affirmative steps to obtain this footage from Amazon, though these efforts were ultimately unsuccessful.

{¶ 74} Since the footage was never in possession of the prosecution or any of its affiliates, Azali asserts that *Brady* imposed upon the state an "obligation[] to secure" the recordings in Amazon's possession. Appt.'s Br. at 26. However, Azali "does not point to any authority for the proposition that *Brady* requires the state to secure and ensure the preservation of evidence not in its possession from third parties." *State v. O.E.P.-T.*, 2023-Ohio-2035, 218 N.E.3d 237, ¶ 78 (10th Dist.). He also does not point to any authority that would suggest unsuccessful attempts by the state to obtain evidence from a third party can constitute a *Brady* violation.

{¶ 75} Contrary to his argument, the Due Process Clause does not generally place upon the State a "duty to gather * * * exculpatory evidence." *State v. Harris*, 8th Dist. Cuyahoga No. 90699, 2008-Ohio-5873, ¶ 52, quoting *State v. Farris*, 2d Dist. Clark No. 2003 CA 77, 2004-Ohio-5980, ¶ 20. Similarly, "Ohio law generally

recognizes that the state need not gather evidence on the defendant's behalf." *State v. Fornshell*, 1st Dist. Hamilton No. C-180267, 2021-Ohio-674, ¶ 103, citing *Kettering v. Baker*, 42 Ohio St.2d 805, 328 N.E.2d 805 (1975).

{¶ 76} It is true that, where the state suppresses material evidence in its possession, the defendant is not required to demonstrate that the defense "could not have discovered suppressed evidence by exercising reasonable diligence." *State v. Hale*, 8th Dist. Cuyahoga No. 112163, 2023-Ohio-3894, ¶ 36, quoting *State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, ¶ 25. Nonetheless, *Brady* still does not require the state to obtain evidence for the defendant that, "with any reasonable diligence, he can obtain for himself." *State v. McFeeture*, 8th Dist. Cuyahoga No. 108434, 2020-Ohio-801, ¶ 13, quoting *United States v. Glass*, 1987 WL 37592, 2 (6th Cir.1987).

> [W]hen the state has failed to gather exculpatory evidence or to fully investigate the allegations, the defendant may either investigate the charge and collect the evidence himself, if such evidence is available, or he may point out the deficiencies in the state's investigation at trial.

*Harris* at ¶ 52, quoting *Farris* at ¶ 20. In this case, Azali installed the Blink security system and was, therefore, aware that this video footage existed. While the record establishes that the state did engage in efforts to obtain these recordings, the record is devoid of any indication that the defense ever attempted to secure this footage.[11]

---

[11] Azali indicates the defense did not seek to obtain these recordings because it was not aware of the contents of the June 3, 2021 police interview with V. until after Amazon's sixty-day retention period for this footage had expired. Tr. at 131. However, Detective Tschetter sent a preservation letter to Amazon on May 28, 2021 *before* the police interview with V. Tr. at 130, 135-136, 1142. Thus, the state sought this footage without

{¶ 77} Ultimately, "[t]he state cannot suppress records that it does not have — and that have never been in the possession of a state agent." *State v. Jury*, 2022-Ohio-4419, 203 N.E.3d 222, ¶ 17 (6th Dist.); *State v. McGuire*, 8th Dist. Cuyahoga No. 105732, 2018-Ohio-1390, ¶ 32, quoting *State v. Zirkle*, 4th Dist. Meigs No. 95 CA 21, 1997 Ohio App. LEXIS 4173, 3 (Aug. 27, 1997). Since neither the state nor any of its affiliates ever had possession or control of these recordings, Azali has failed to establish that the loss of this video footage constituted a *Brady* violation under the facts of this case.

{¶ 78} In conclusion, Azali was unable to demonstrate that this video footage was material evidence because the recordings were never viewed. Thus, "we are left with the inability to say that the videotape would show a clear set of facts that would * * * support a full dismissal" of this case. *Durham*, *supra*, at ¶ 21. The record also contains no indication that the state acted in bad faith or ever had possession of the video footage at issue. For these reasons, Azali has failed to establish a due process violation. Thus, we conclude that the trial court did not err in denying his motion to dismiss. His second assignment of error is overruled.

*Fourth Assignment of Error*

{¶ 79} At trial, the defense called Clarence B. Kemper to testify as an expert on military training. In response, the state called an expert on the use of force, Kevin

---

knowing the content of V.'s police interview. Azali has not provided any explanation as to why the defense could not or did not do the same.

R. Davis, to testify as a rebuttal witness. On appeal, Azali argues that Davis gave an impermissible opinion on the ultimate issue in this case.

Standard of Review

{¶ 80} Generally, "[a] ruling concerning the admission of expert testimony is within the broad discretion of the trial court and will not be disturbed absent an abuse of discretion." *State v. Yates*, 71 Ohio St.3d 219, 221, 643 N.E.2d 105 (1994). "Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of [the rules of evidence] are met." *State v. Nemeth*, 82 Ohio St.3d 202, 207, 694 N.E.2d 1332 (1998). However, where a party fails to raise an objection before the trial court, all but plain error is waived on appeal. *State v. Gardner*, 8th Dist. Cuyahoga No. 111506, 2023-Ohio-307, ¶ 43.

{¶ 81} In this case, the parties dispute whether the defense properly preserved the challenges to the two identified portions of Davis's testimony for review. The first challenged portion of Davis's testimony reads, in its context, as follows:[12]

> [Prosecutor:] Have you in your experience as an officer seen crime scenes that clearly involve rage? Have you seen—
>
> [Defense Counsel]: Objection.
>
> [Trial Court:] Sustained.
>
> [Davis:] Have you seen scenes that are indicative of executions?

---

[12] The italicized portion of the following exchange is the testimony that Azali challenges on appeal. The remainder of this exchange is only provided for context.

[Defense Counsel]: Objection.

[Trial Court:] Sustained.

[Prosecutor:] Let's talk about the bedroom.

[Defense Counsel:] Can we strike the question, strike all of that?

[Trial Court:] All right. The Court will strike out—as I've told you both for the defense and the State, what the attorneys say is not evidence. The Court will strike out those last two questions and instruct the jury to disregard them. Put another question.

[Prosecutor:] *Based on your knowledge of training and experience, was that third shot essential for self-defense?*

[Davis:] *No.*

[Prosecutor:] What was it indicative of?

[Defense Counsel:] Objection.

[Trial Court:] Overruled. He can answer.

[Davis:] I've seen head shots in my time on the street, intentional head shots, they were indicative of rage or premeditation.

[Defense Counsel:] I renew my objection.

[Trial Court:] Okay. Let's try to confine this to the facts of this case. The Court is going to strike out that question and answer, and let's just try to focus on the facts in this particular case and the modicum level of force.

[Prosecutor:] Let's talk –

[Trial Court:] I instruct the jury to disregard the question and answer. Go ahead.

Tr. at 1822-1824.  In this exchange, the defense objected numerous times but not to this portion of testimony that is challenged on appeal.   Further, the defense

repeatedly objected to questions about what these shots indicated but never objected on the grounds that Davis was offering an impermissible opinion on the ultimate issue. Thus, in this exchange, the defense did not prompt a ruling from the trial court on the issue raised in this assignment of error.

{¶ 82} The second portion of Davis's testimony that Azali challenges on appeal reads, in its context, as follows:[13]

[Prosecutor:] Are you familiar with the rules of self-defense in Ohio?

[Davis:] I am, yes.

[Prosecutor:] What are the different—what's the first part in self-defense? If we need to establish it was not self-defense, the State would have to prove what?

[Davis:] They would have to prove that the subject was, number one, the aggressor in the incident.

[Prosecutor:] Are you rendering an opinion on that section?

[Davis:] I'm not rendering an opinion as to the events that led up to the shooting, no.

[Prosecutor:] What's the second?

[Davis:] The second is that the defendant reasonably articulates a perception of his life was being threatened with death or serious bodily harm.

[Prosecutor:] What's the third?

[Davis:] The third is that the subject uses a reasonable amount of force.

---

[13] The italicized portion of the following exchange is the testimony that Azali challenges on appeal. The remainder of this exchange is provided for context.

[Prosecutor:] Okay. Reasonable amount of force, the third one. Based on everything you've reviewed, testimony at the scene, what's your opinion on that issue?

[Davis:] That Mrs. Azali—

[Defense Counsel]: We're objecting to all of this—

[Trial Court:] Sustained.

[Defense Counsel:] —his recitation of the law, all of it.

* * *

[Trial Court:] * * * Now you're objecting to the last question?

[Defense Counsel:] All of him stating the law in Ohio and misstating the law in Ohio.

[Trial Court:] Hold on. Again, I don't want argument in front of the jury. The Court is going to instruct you on the law in the State of Ohio. Okay? * * * I'm going to give you the law on self-defense and the various elements. So I'm going to sustain the objection.

[Defense Counsel:] On the off chance, Your Honor, that that was written down by any of the jurors, could you direct that it be stricken, please?

* * *

[Trial Court:] * * * I've already instructed and the jury is assumed that you will follow my instructions. I am going to give you the elements of self-defense. What this witness says, even though he's an expert on use of force, I am going to give you the law in the State of Ohio regarding self-defense. So in terms of him testifying as to the various elements of self-defense, disregard anything this witness said and I will give you the elements of self-defense at the conclusion of this case.

[Prosecutor:] *I'm just going to you ask about your opinion on the reasonableness of the use of force here. What is your opinion as to that without giving the law?*

[Davis:] *That the second and third shot were excessive use of force.*

Tr. at 1827-1830.

{¶ 83} After this challenged exchange, the defense did not raise an objection for the remainder of Davis's testimony on direct examination. Thus, the defense did not raise a specific objection to the second portion of Davis's testimony that is challenged on appeal. Further, the objection raised in this exchange addressed Davis's descriptions of the elements for self-defense. The trial court sustained this objection and gave an instruction to the jury. The prosecutor then adjusted the question to account for the trial court's ruling, directing Davis to give an answer "without giving the law[.]" Tr. at 1830. The defense did not object to the modified question and did not object on the grounds that Davis was giving an impermissible opinion on an ultimate issue.[14] Thus, as with the first challenged portion of Davis's testimony, the defense did not prompt a ruling from the trial court on the issue raised in this assignment of error. In the absence of determinations from the trial court to review, we will examine these two portions of testimony for plain error only.

[14] Before the trial began, the trial court indicated that it would not permit the experts to give any ultimate issue testimony. Tr. at 122-126. Azali identifies these pretrial statements as a reason that the plain error standard should not be applied on appeal. But any preliminary ruling that the trial court may have issued was tentative and insufficient to preserve the issue for review. *See State v. Ware*, 8th Dist. Cuyahoga No. 99374, 2013-Ohio-4492, ¶ 12-14. The fact remains that Azali did not challenge the admission of this testimony at trial and did not prompt a final determination from the trial court on the issue he raises herein.

*Legal Standard for Expert Testimony*

{¶ 84} "Evid.R. 702 governs the admissibility of expert testimony." *State v. Ferricci*, 8th Dist. Cuyahoga No. 110208, 2022-Ohio-1393, ¶ 65. Under Evid.R. 702, a witness may offer testimony as an expert if

> (1) the witness' testimony relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training or education regarding the subject matter of the testimony and (3) the witness' testimony is based on reliable scientific, technical or other specialized information.

*State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 83 (8th Dist.). Evid.R. 702 provides for expert testimony because "the jury is unable to draw proper inferences from the facts in certain situations." *Ferricci* at ¶ 66, quoting *State v. Campbell*, 1st Dist. Hamilton Nos. C-010567 and C-010596, 2002-Ohio-1143, 3. "The purpose of expert testimony is to assist the trier of fact in determining a fact, issue, or understanding the evidence." *Ferricci* at ¶ 66.

{¶ 85} Further, Evid.R. 704 states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."

> Thus, Evid.R. 702, in conjunction with Evid.R. 704, permits expert testimony and opinion on 'an ultimate issue to be decided by the trier of fact' if the witness is qualified as an expert with 'scientific, technical or other specialized knowledge' and if his testimony or opinion will assist or help the trier of fact to understand the evidence or to decide an issue of fact.

*State v. Baker*, 92 Ohio App.3d 516, 533, 636 N.E.2d 363 (8th Dist.1993). "However, expert testimony is inadmissible" regarding matters that are "within the ken of the jury[.]" *State v. Koss*, 49 Ohio St.3d 213, 551 N.E.2d 970 (1990).

{¶ 86} Further, the second element of self-defense contains objective and subjective components. *Thomas*, *supra*, at 330. For self-defense to apply, "there must be both reasonable (objective) grounds to believe that harm is imminent, and an honest (subjective) belief that harm is imminent." *Parma v. Treanor*, 2018-Ohio-3166, 117 N.E.3d 970, ¶ 25 (8th Dist.). "Since Ohio has a subjective test for self-defense, 'the defendant's state of mind is crucial to this defense.'" *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 37, quoting *Koss* at 215. But beyond this, the second element still requires "that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *Ratliff*, *supra*, ¶ 31, quoting *Hendrickson*, *supra*, at ¶ 31.

{¶ 87} "Except for a narrow exception in cases involving the battered woman syndrome, expert testimony regarding a defendant's state of mind is inadmissible to prove self-defense." *State v. Taylor*, 78 Ohio St.3d 15, 676 N.E.2d 82 (1997). This is because "[t]he determination of whether a defendant has a reasonable belief that he was in imminent danger of death or great bodily harm is not beyond the comprehension of the average juror." *State v. Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 52 (2d Dist.). Similarly, the jury is generally "capable of determining whether the use of force in self-defense is reasonable * * *." *State v. Gray*, 2d Dist. Montgomery No. 26473, 2016-Ohio-5869, ¶ 30, quoting *State v. Salazar*, 182 Ariz.

604, 610, 898 P.2d 982 (App.1995). *State v. Gott*, 6th Dist. Lucas No. L-11-1070, 2013-Ohio-4624, ¶ 20; *State v. Johnson*, 10th Dist. Franklin No. 02AP-373, 2002-Ohio-6957, ¶ 38.

Legal Analysis

{¶ 88} During a pretrial hearing, the defense and the state each sought permission to call an expert witness to discuss the fact that Azali shot Mwaka three times in the head at close range. The defense explained its reasons for seeking to call an expert on army training, Clarence B. Kemper, to testify about the techniques that Azali would have been taught in the military. The defense stated that Kemper's opinions, as set forth in his written report, went to Azali's "training and * * * his state of mind at the time of the incident on May 26, 2021." Tr. at 75. The defense then explained:

> [W]hen you look at self-defense you have to look at the bona fide and the reasonableness. They're two separate standards, and I believe the evidence which our expert would offer here goes to an explanation as to why * * * our client acted as he did, as to his training and * * * what these people [soldiers] are trained to do under these particular circumstances, so I think it goes to the heart of the defense.

*Id.* at 76. The defense further explained that what Kemper could do was "illuminate for the jury why you have two shots versus one shot or three shots versus two shots or why don't we have a shot in the leg." *Id.* at 79.

{¶ 89} In response, the state discussed calling an expert on the use of force, Kevin R. Davis. The state explained the following:

Well, if they're [the defense] allowed to bring up their expert, we have an expert that will testify that any one of the three shots to Mwaka has her out of the fight, so this is tricky.

If they're going to be allowed to have their expert, we can definitely have our expert at the very least called as rebuttal. * * *

Tr. at 84. The state concluded by asserting that "[t]hey [the defense] have a wife that was brutally murdered and three shots to the head, and they have to explain no, no, no, that's normal for an Army guy to do." *Id.* The trial judge then stated she was "going to let in both" experts but that "the State should have * * * [its] expert testify in rebuttal." *Id.* at 87.

{¶ 90} At trial, Kemper affirmed that soldiers are trained to fire three main shots at an assailant: "two controlled shots" at center mass before a firing third "incapacitating shot."[15] Tr. at 1417. Kemper then added that, in situations of close combat, soldiers are also trained to "close distance" with the assailant. He affirmed that the soldier was to fire at the assailant "[u]ntil you have an incapacitating shot[.]" *Id.* at 1418. He explained,

"the only way to know they're [an assailant] dead is to put a round in their face because all the shots in the chest might be hitting a plate [body armor] * * *."

So they trained us to approach bang, bang, bang, and then when you can, get the shot in the face.

---

[15] On cross-examination, Kemper explained that the shots fired at center mass were directed at a person's torso while an "incapacitating" shot referred to a "head shot." Tr. at 1445-1446.

*Id.* at 1419. Kemper emphasized that this training "go[es] against" a person's "initial instincts" because a person intuitively moves away from an armed assailant. *Id.* at 1422. Kemper's testimony on redirect concluded with the following exchange:

> [Defense Counsel:] So once you * * * make the decision to use deadly force, from that point forward * * * you're going to use as much force as possible * * * until you get that incapacitating shot; is that fair to say?
>
> [Kemper:] Yes.
>
> [Defense Counsel:] It doesn't matter whether it's three shots or four shots or five shots. You're going to close the gap, you're going to keep shooting, bo[om], boom, boom until you get that incapacitating shot and then you're going to disarm; is that fair to say?
>
> [Kemper:] Correct.

Tr. at 1467-1468. Kemper had previously noted that some steps of this process may "seem[] brutal" but that this training becomes "second nature." Tr. at 1419, 1464.

{¶ 91} The state subsequently called Davis to testify as a rebuttal witness. During his testimony, the state sought Davis's opinions on Kemper's conclusions and inquired into whether Azali acted in accordance with the techniques that Kemper had described. Tr. at 1802. The prosecution noted in a question to Davis that Azali had reportedly been trained to fire "two to the chest, one to the head[.]" *Id.* at 1871. Davis affirmed that Azali did not "follow that protocol[.]" *Id.* at 1872.

{¶ 92} As to the injuries Mwaka suffered, Davis noted that the two initial shots that Azali had fired were "brain shots" and that "Mrs. Azali would have been incapable of continuing after the first shot." Tr. at 1822. The prosecution then

questioned Davis about the final shot that caused the contact wound on Mwaka's face in the first exchange Azali challenges herein:

> [Prosecution:] Based on your knowledge training and experience, was that third shot essential for self-defense?
>
> [Davis:] No.

*Id.* at 1823. Kemper had previously testified that Azali would have been trained to fire until the assailant was incapacitated. In response, Davis appears to be emphasizing the fact that the contact wound on Mwaka's face was not necessary to incapacitate her.

{¶ 93} Further, Davis's statements were in accord with the earlier trial testimony of the medical examiner, Dr. Thomas Gilson, who stated that the first two shots were fatal and would have caused Mwaka to lose consciousness immediately. Tr. at 1215. Thus, the primary thrust of Davis's testimony was effectively cumulative to this prior testimony. Given the facts of this case, we conclude that this testimony does not present the exceptional circumstance in which notice of plain error is necessary to avoid a manifest miscarriage of justice.

{¶ 94} Next, we turn to examining the final portion of Davis's testimony that Azali challenges on appeal:

> [Prosecution:] I'm just going to ask you about your opinion on the reasonableness of the use of force here. What is your opinion as to that without giving the law?
>
> [Davis:] That the second and third shot were excessive use of force.

Tr. at 1830. We find that Davis gave an impermissible opinion as to whether Azali's actions satisfied the second element of self-defense in this case. We must now determine whether this testimony rises to the level of plain error.

{¶ 95} In this case, an expert witness for the defense and an expert witness for the state gave alternative explanations as to why Azali shot his wife three times in the head at close range. Kemper's testimony indicated that Azali would have been trained to act inconsistently with how a person's "initial instincts" would lead them to respond to an armed assailant. Tr. at 1422. He further testified that Azali's actions—from discharging his gun three times to closing the distance with Mwaka to firing the contact shot at her face—were consistent with his military training. The state then called Davis as a rebuttal witness to discuss Kemper's conclusions. During his testimony, Davis questioned the applicability of these defensive techniques in the situation that Azali purportedly faced. He also questioned whether Azali did, in fact, act consistently with his military training.

{¶ 96} Since the trial court permitted Kemper and Davis to be called as witnesses, the jury was presented with two competing explanations for Mwaka's injuries that were each supported by expert testimony. This minimizes the potential impact of the challenged testimony. After Davis testified, this statement was not underscored by later references during closing arguments or in any subsequent testimony. The trial court also did not permit the admission of either expert report into evidence. Tr. at 2049. Further, this challenged testimony represents one statement that occurred at a trial that lasted two weeks and at which twenty-one

witnesses testified. For these reasons, we conclude that this statement does not present the exceptional circumstance in which notice of plain error is necessary to avoid a manifest miscarriage of justice. Since Azali has not established plain error, his fourth assignment of error is overruled.

## *Conclusion*

{¶ 97} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of Cuyahoga County Court of Common Pleas is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARK C. MILLER, PRESIDING JUDGE


_____
WILLIAM R. ZIMMERMAN, JUDGE


_____
JOHN R. WILLAMOWSKI, JUDGE


Judges Mark C. Miller, William R. Zimmerman and John R. Willamowski, from the Third District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.