[Cite as *State v. Scott*, 2022-Ohio-2768.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                    :

                                          No. 110744

v.                                               :

JOHNATHON R. SCOTT,                              :

    Defendant-Appellant.                   :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 11, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-650243-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kerry Sowul, Assistant Prosecuting Attorney, *for appellee*.

Russell S. Bensing, *for appellant*.

ANITA LASTER MAYS, P.J.:

{¶ 1} Defendant-appellant Johnathon R. Scott appeals his jury trial convictions for multiple sexual offenses. We affirm.

## I.    Facts and Procedural History

{¶ 2}   On April 27, 2020, Scott was indicted on fourteen counts of sexual offenses against minor Jane Doe over a six-year period.  Each rape count alleged that Scott purposefully compelled the victim to submit by force or threat of force:

Count 1:   Rape, R.C. 2907.02(A)(1)(b), for fellatio on or about April 16, 2020, victim suffered serious physical harm, victim older than 10 and younger than 13;

Count 2:   Attempted rape, R.C. 2923.02/2907.02 (A)(1)(b), for digital vaginal penetration on or about April 16, 2020;

Count 3:   Rape, R.C. 2907.02(A)(1)(b), fellatio on or about August 23, 2014, to August 22, 2015, victim suffered serious physical harm, victim was under the age of 10 at time of offense;

Count 4:   Gross sexual imposition, R.C. 2907.05(A)(4), touched vagina on or about August 23, 2014, to August 22, 2015;

Count 5:   Rape, R.C.2907.02(A)(1)(b), fellatio on or about August 23, 2015, to August 22, 2016, victim was under the age of 10 at time of offense;

Count 6:   Gross sexual imposition, in violation of R.C. 2907.05 (A)(4), touched vagina on or about August 23, 2015;

Count 7:   Rape, in violation of R.C. 2907.02(A)(1)(b), fellatio on or about August 23, 2016, to August 22, 2017, victim was under the age of 10 at time of offense;

Count 8:   Gross sexual imposition, R.C. 2907.05(A)(4), touched vagina on or about August 23, 2016, to August 22, 2017;

Count 9:   Rape, in violation of R.C.2907.02(A)(1)(b), fellatio on or about August 23, 2017, to August 22, 2018, victim was under the age of 10 at time of offense;

Count 10: Gross sexual imposition, in violation of R.C. 2907.05(A)(4), touched vagina on or about August 23, 2017, to August 22, 2018;

Count 11: Rape, in violation of R.C. 2907.02(A)(1)(b), fellatio on or about August 23, 2018, to March 21,2019, victim older than 10 and younger than 13;

Count 12: Gross sexual imposition, in violation of R.C. 2907.05(A)(4), touched vagina on or about August 23, 2018, to March 21, 2019;

Count 13: Rape, in violation of R.C. 2907.02(A)(1)(b), fellatio on or about August 23, 2019, to March 21, 2020, victim older than 10 and younger than 13; and

Count 14: Gross sexual imposition, R.C. 2907.05(A)(4), touched vagina on or about August 23, 2019, to March 21, 2020.

{¶ 3}    Trial commenced on June 28, 2021. Over defense objections, the trial court allowed the state to amend the indictment's pursuant to Crim.R. 7(D):

Count 2: Attempted rape, R.C. 2923.02/2907.02 (A)(1)(b), for digital; vaginal penetration on or about April 16, 2020, was amended to delete serious physical harm;

Count 3: Rape, R.C. 2907.02(A)(1)(b), fellatio on or about August 23, 2014, to August 22, 2015, victim suffered serious physical harm, victim was under the age of 10 at time of offense, was amended to change the offense period to August 23, 2013, to August 22, 2014, and digital penetration instead of fellatio;

Count 4: Gross sexual imposition, R.C. 2907.05(A)(4), touched vagina on or about August 23, 2014, to August 22, 2015, was amended to touched vagina or thigh; and

Count 9: Rape, in violation of R.C.2907.02(A)(1)(b), fellatio on or about August 23, 2017, to August 22, 2018, victim was under the age of 10 at time of offense, was amended to digital penetration.

{¶ 4}    The state dismissed Counts 1, 6, 8, 12, and 14. (Tr. 556-564.)[1]  The state rested. Scott moved for acquittal under Crim.R. 29 at the close of the state's

---

[1] The remaining counts were renumbered 1 through 9.

case for, "[r]remaining Counts 2, attempted rape and 3, and rape; Count 4, gross sexual imposition; Count 5, rape; Count 7, rape; Count 9, rape; Count 10, gross sexual imposition; Count 11, rape; Count 13, rape." (Tr. 566.) The trial court granted the motion on Counts 7, 11, and 13 for lack of specificity. The defense rested.

{¶ 5} On July 8, 2021, the jury returned guilty verdicts as follows:

For the April 2020 encounter, renumbered Count 1 (originally Count 2), attempted rape, R.C. 2923.02, 2907.02(A)(1)(b), a second-degree felony, for digital vaginal penetration on or about April 16, 2020, and that Scott did purposely compel the victim, who was under 13 years of age, but ten years of age or older at the time of the offense, to submit by threat of force;

For the August 23, 2014, to August 22, 2015 encounter for touching the vagina or thigh, renumbered Count 3 (originally Count 4), gross sexual imposition, R.C. 2907.05(A)(4), a third-degree felony, and the victim was less than 13 years of age at the time of the offense;

For the August 23, 2015 to August 22, 2016 encounter, renumbered Count 4 (originally Count 5) rape, R.C. 2907.02(A)(1)(b), a first-degree felony, and that Scott did purposely compel the victim, who was under ten years of age at the time of the offense by threat of force; and

For the August 23, 2017 to August 22, 2018 encounter, renumbered Count 6 (originally Count 10), gross sexual imposition, R.C. 2907.05(A)(4), a third-degree felony, and the victim was less than 13 years of age at the time of the offense.

Scott was found not guilty of Counts 2 and 5 (originally Counts 3 and 9), rape, R.C. 2907.02(A)(1)(b).

{¶ 6} The convictions did not merge because the offenses took place at different times. On July 20, 2021, the trial court sentenced Scott to:

A prison sentence at the Lorain Correction Institution of life. Count 1 (F2): 8-12 years; Count 3 (F3): 5 years; Count 4 (F1): life with parole eligibility in 25 years; Count 6 (F3): 5 years. The sentences in Counts 1, 3, and 6 are to run consecutive to each other, but concurrent to the

sentence in Count 4. The sentences in Counts 1 and 4 are mandatory time. Defense counsel objects to the imposition of an indefinite sentence in Count 1, pursuant to Reagan Tokes.

Journal entry No. 11795323, p. 1 (July 22, 2021). Scott was also informed of mandatory postrelease control ("PRC") and declared to be a Tier III sex offender for Counts 1 and 4, and a Tier II sex offender for Counts 3 and 6.

{¶ 7} Scott appeals.

## II.  Assignments of Error

{¶ 8} Scott assigns two issues as error:

I.  The trial court erred in entering a judgment of conviction that was against the manifest weight of the evidence.

II.  The trial court erred in imposing a maximum sentence on the count of attempted rape in accordance with the Reagan Tokes Act.

## III.  Discussion

### A.  Manifest Weight

### 1.  Standard of review

{¶ 9} It is axiomatic that "'A challenge to the manifest weight of the evidence questions whether the state has met its burden of persuasion.'" *In re D.C.*, 8th Dist. Cuyahoga No. 102165, 2015-Ohio-4367, ¶ 13, quoting *State v. Byrd*, 8th Dist. Cuyahoga No. 98037, 2012-Ohio-5728, ¶ 27. "'The weight-of-the-evidence standard addresses the evidence's effect of inducing belief.'" *In re D.C.* at ¶ 13, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 386-387, 678 N.E.2d 54 (1997). In

contrast, a "sufficiency of the evidence" analysis "is a test of adequacy rather than credibility or weight of the evidence., citing *Thompkins* at 386."

{¶ 10} Scott argues that the manifest weight standard is flawed and that it "commingles the concepts of sufficiency and manifest weight" because a sufficiency analysis "does not consider credibility but must view the state's evidence in the most favorable light — essentially assuming the state's witnesses are credible." Appellant's brief at p. 10. As a result, Scott poses, ""[i]n a manifest weight reversal, "the appellate court sits as a "thirteenth juror" *and disagrees with the factfinder's resolution of the conflicting testimony.*""" (Emphasis added.) *Id.*, quoting *Thompkins, supra* at 387 (emphasis added.), quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2 652 (1982). Therefore, Scott offers, "[a]n appellate court will never disagree with the fact-finder's resolution of the conflicting testimony if it invariably defers to the fact-finder's resolution of the conflicting testimony." Appellant's brief at p. 10.

{¶ 11} Scott urges the court to recognize that the "manifest weight concept assumes that jurors and judges make mistakes, and that concept goes out the window if in making the analysis the appellate [court] invariably defers to the credibility determinations of jurors and judges." Appellant's brief at p. 11. However, as Scott acknowledges, "the requirement that a [manifest weight] reversal be reserved for cases where 'the [fact finder] clearly lost its way and created a manifest miscarriage of justice' and 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction'" is a more than adequate

safeguard to the general sanctity of the fact-finder's verdict. Appellant's brief at p. 10-11, quoting *Thompkins* at 387.

{¶ 12} This court's analysis is governed by the quoted safeguard. We therefore proceed accordingly.

### 2. Analysis

{¶ 13} Scott's manifest weight challenge is to the four convictions. The elements are defined below.

{¶ 14} R.C. 2907.02(A)(1)(b) that governs rape provided at the time:

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies: * * *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

{¶ 15} In addition,

"[s]exual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶ 16} R.C. 2923.02(A) provides: "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." *Id.*

{¶ 17} R.C. 2907.05(A)(4), gross sexual imposition, provides:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies: * * *

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

*Id.*

{¶ 18} Scott argues the state failed to prove beyond a reasonable doubt that Scott committed the offenses. We disagree.

{¶ 19} Jane Doe's mother ("Mother") testified that Doe is Mother's only child. Doe was 12 years of age at the time of trial, and was approximately four or five years of age when Mother began dating Scott. Scott effectively resided with Mother and Doe from 2014 to 2020.

{¶ 20} Mother stated that, on August 16, 2020,[2] Doe awakened Mother around 4:00 a.m.:

Mother: When she woke me up, Mr. Scott was trying to keep her quiet. And I asked her, I said, Baby, what's wrong? I went over to her and she said, Mommy, he has been touching me since I was six years old and she broke down and cried.

State: When you say Mr. Scott was trying to keep her quiet, what do you mean?

Mother: He was grabbing on her throat and pushing her against the wall telling her to shut up. I grabbed him and I grabbed her. I took her into her room and I asked her what's going on, and that's when she told me.

---

[2] Mother initially testified that the date of the confrontation was August 16, 2020, but clarified during cross-examination that the incident occurred on April 16, 2020, and not August.

(Tr. 334-335.)

{¶ 21} Mother continued:

Mother: I asked [Doe] — I took [Doe] to her room by herself and I asked her what was going on. That's when she told me that he was touching her and then I said we had to go, we had to leave the home.

State: What do you do with that information at that point?

Mother: At that point I get my phone and my keys. I give my keys to [Doe]. I tell her to go get into the car and lock the door and I am coming.

State: Do you do anything in relation to Mr. Scott? Do you confront him?

Mother: Yes, I confronted him and I said you were touching my baby?

State: What happened at that point?

Mother: And he told me no, she was lying, and he started crying.

(Tr. 335.)

{¶ 22} Mother testified that Scott ran after her and Doe, but they were able to make it to Mother's car. Mother drove toward her sister's home in Elyria, Ohio and took Doe to the Cleveland Clinic in Lorain, Ohio. The clinic directed them to The Nord Center where they remained for several hours and were joined by the Cuyahoga Metropolitan Housing Authority ("CMHA") police. Assisted by family members, Mother and Doe picked up their belongings and moved. Mother did not call police the moment she secured her phone from Scott because her focus was to get Doe to safety.

{¶ 23} Scott frequently cared for Doe while Mother was at work. Scott also had a daughter close to Doe's age and two sons who were a few years older than Doe. The daughter frequently stayed at Mother's house on weekends and the daughter and Doe had a good relationship.

{¶ 24} Denise Miller ("Miller"), a sexual assault nurse examiner ("SANE") with The Nord Center, examined Doe. Miller conducted a "[h]ead-to-toe examination with a detailed genital exam." (Tr. 376.) Swabs and photographs were taken of the mouth, fingernails, vaginal and anal areas and Doe was examined for cuts and bruises. Miller listed in her notes that Mother identified Scott as the perpetrator. Doe informed Miller that she was vaginally and orally penetrated by Scott's fingers and penis. Doe said Scott used lotion for lubrication and put his hand on her neck to hold her down. The physical examination did not reveal evidence of the offense and indicated that "[e]verything is within normal limits." (Tr. 397.) Miller's notes said there were no lacerations, bruising and the "hymen was within normal limits." (Tr. 400.)

{¶ 25} Stephanie Moore ("Moore"), a sexual abuse intake social worker with the Cuyahoga County Division of Children and Family Services ("CCDCFS") testified that the agency receives hotline referrals for medical and psychological services for reported sexual assault victims. Moore responded to the hotline referral for Doe.

{¶ 26} Moore explained that a case is deemed "substantiated" by agency standards "when there is reason to believe that the incident took place due to access to the perpetrator or different collateral or evidence that was brought in, and also

due to a child's disclosure with detail." (Tr. 446.) Moore concluded that Doe's case was substantiated. Moore did not request the SANE report but spoke with the victim's advocate and determined that no serious injury was reported and there was no indication that Mother as caretaker posed a safety concern which was a primary consideration. Moore referred the family for follow-up STD testing and mental-health services.

{¶ 27} Doe testified that her relationship with Scott changed when she was five. Scott walked into her room and sat down beside her while they talked about her field trip with her class. Scott touched her thigh and she told him to stop. The trial court called for a recess because Doe testified that Scott returned to her room shortly after she got into bed, removed her covers and underwear, and touched her vagina that Doe referred to as her private area. Doe next felt "something trying to force inside" her private area. Mother was at the store and Doe heard the door unlock downstairs. Scott "rushed out of the room." (Tr. 465.) Doe said she did not tell Mother because Scott told her that "he was going to do something and he said if I told my mom, he was going to beat me." (Tr. 466.)

{¶ 28} Doe stated that, "[t]he next time [Scott made her feel uncomfortable] was when I was like around seven. It happened other times, but this one I'm going to talk about is the one I remember." (Tr. 467.) Doe said she was laying on a mattress on the living room floor that was used by the family to watch television and playing with her tablet. Scott put a "porn video" on the television, removed her underwear and engaged in sexual contact. Afterward, Scott "tried to act like

everything was normal." (Tr. 470.) Mother was at work. Doe did not tell Mother for fear that Mother would not believe her.

{¶ 29} The next encounter Doe described occurred when Doe was nine. Doe returned from her grandmother's home in Pennsylvania. Mother was not at home when Doe arrived, and Scott was talking with Mother on the telephone. Scott handed Doe the phone and Doe began to cry.

> Doe: So I was crying and stuff and [Mother] was asking me why I was crying and he was in the doorway and he just like, it was like he didn't want me to say anything. So I just told her I miss my grandma and my cousins and she said, okay. I'm going to see them soon.
>
> State: How do you know that?
>
> Doe: Because he made like faces and he was just like standing there. And like he was like, don't say anything, so I didn't say anything.

 (Tr. 474.)

{¶ 30} After the telephone call, Scott instructed Doe to enter Mother's bedroom, remove her clothing while he removed his, and initiated sexual contact with attempted penetration. Doe told him to stop but he continued. Afterward, Scott told Doe to shower and "[t]ried to act like everything was normal again." (Tr. 475.)

{¶ 31} The next encounter occurred in April 2020. Doe locked her bedroom door, but Scott unlocked the door and entered the bedroom about 3:00 a.m. or 4:00 a.m. Scott told Doe to perform fellatio and exposed himself. Doe refused and told Scott she was going to tell Mother and Scott responded, "we'll see about that."

(Tr. 477.)  Doe entered the bathroom, locked the door and was crying but Scott was able to unlock the door and told her to stop crying or her Mother would hear.

{¶ 32}  Doe continued,

Doe:  So then he opened the door and he kind of like put his hand around my neck and then he told me to stop crying.  And then I stopped crying and I was just thinking like I'm going to tell my mom.

So I opened the door.  He was standing in front of the doorway and I told him, let me just see my mom and let me speak to her. So he moved out of the way.  He was walking towards the bed and he was like on the right side of the bed.  He was laying down. And I was just like, I was shaking my mom.

State: Okay.

Doe:  And then she woke up and she asked me like why was I crying? * * * I told her that [Scott] had touched me. * * *

She looked at him and she started crying and  she grabbed me and we went to my room and he was just  saying how — he was just saying how I was lying and my mom, she wasn't understanding.  So I told her and then she just grabbed her coat and everything and then he was trying to stop us and he grabbed my phone and my mom told him to give me back my phone and he was just crying.

And then I was screaming, like, stop lying and tell the truth. Don't say I was lying.  We just — we ran downstairs.  He ran like he was guarding the front door and he was just crying and just kept on saying I was lying.  I'm telling the truth.  My mom and me, we went out the back door.  So we were running to the car and I was already — it was snowing, so I ran to the car.  I was in the passenger's seat.  My mom, she was like, she unlocked the door herself, but she was like — he was trying to stop her and he was trying to open the door.  And  then she got in the car and she turned the car on and we just left.

(Tr. 477-479.)

{¶ 33} Doe's testimony regarding the trip with Mother to Elyria, the hospital and The Nord Center generally echoed Mother's recount. Doe met with a detective and a lady that interviewed her about what happened. Doe testified that there were other encounters with Scott but that she talked about the ones that she remembered well. Doe also said that Scott would frequently come into her room when Mother was asleep or not at home and have Doe perform fellatio. During cross-examination, Doe denied that the first time she said Scott played pornography during an encounter was at trial and that she informed the advocate and other interviewers in April 2020 of that fact.

{¶ 34} Forensic scientist Hristina Lekova ("Lekova") with the Cuyahoga County Regional Forensic Science Laboratory testified to the results of the sexual assault kit examination. Doe's swabs revealed no seminal material and only Doe's DNA, except for a single fingernail swab which was negative for Scott's DNA. Lekova stated that it is possible for sexual contact to take place without leaving DNA evidence. Lekova also explained that some individuals shed greater amounts of detectable amounts of DNA epithelial cells than others.

{¶ 35} Stacee Wright ("Det. Wright") was employed by the CMHA police department as a detective who specialized in sexual assault cases at the time of the incident. The dispatch center received a call from Mother reporting the sexual assault and that they were traveling to Elyria to Mother's sister's home. CMHA learned that Mother and Doe were seeking medical treatment at The Nord Center.

Det. Wright met with them there and conducted a one-on-one meeting with Doe after the SANE examination.

{¶ 36} Det. Wright talked with the advocate, family members in Elyria and Pennsylvania and contacted CCDCFS for information and regarding Scott's whereabouts. The CMHA detective team determined there was probable cause to arrest Scott. Scott was mirandized and requested an attorney.

{¶ 37} During a review of Det. Wright's report, Doe informed the detective that Scott attempted to vaginally penetrate her with his penis during the April 2020 encounter and not that he requested oral sex. Det. Wright also stated that all of the evidence that was collected such as Doe's bed linen was not sent for testing at the determination of evidence technician Sgt. Kyle White. (Tr. 550.)

{¶ 38} Scott cites the lack of physical evidence of the encounters and inconsistencies in Doe's statements to support the convictions. A review of the record reveals that Doe described the encounters in detail and stated that there were other encounters but the four described are the ones she remembered the most. While the SANE examination and kit revealed no physical evidence of sexual activity or Scott's DNA, "a physical injury is not a condition precedent to a conviction for rape; not all rape victims exhibit signs of physical injury." *State v. Leonard*, 8th Dist. Cuyahoga No. 98626, 2013-Ohio-1446, ¶ 46. A victim's testimony concerning penetration need not be corroborated by the medical evidence. *See State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 6 (May 28,

1996) (even without corroborating medical evidence, a victim's testimony that the perpetrator placed his penis in her vagina constitutes penetration).

{¶ 39} Also, "it is well-established that physical evidence is not required to support a conviction for rape or gross sexual imposition against a manifest weight challenge." *State v. Thomas*, 2d Dist. Montgomery No. 27362, 2018-Ohio-4345, ¶ 25, citing *State v. West*, 10th Dist. Franklin No. 06AP-11, 2006-Ohio-6259, ¶ 18; *State v. Thomas*, 2015-Ohio-5247, 54 N.E.3d 732, ¶ 31 (9th Dist.); *State v. White*, 3d Dist. Seneca No. 13-16-21, 2017-Ohio-1488, ¶ 54; *State v. Williams*, 2017-Ohio-8898, 101 N.E.3d 547, ¶ 19 (1st Dist.).

{¶ 40} "'[T]he jury was free to believe, or disbelieve, any part of the witnesses' testimony, and a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony.'" (Citations omitted.) *Thomas*, 2d Dist. Montgomery No. 27362, 2018-Ohio-4345, at ¶ 26, quoting *State v. Arega*, 2012-Ohio-5774, 983 N.E.2d 863, ¶ 30 (10th Dist.).

{¶ 41} Doe expressly testified that Scott threatened retaliation or punishment if Doe told Mother. Further, as to the element of force, Scott resided with Doe for approximately eight years. Though Scott was not Doe's father, he represented a father or parental figure or, at the very least, "a position of authority and, therefore," Scott can be convicted of raping Doe "'with force pursuant to R.C. 2907.02(A)(1)(b) * * * without evidence of express threat of harm or evidence of significant physical restraint.'" *State v. Milam*, 8th Dist. Cuyahoga No. 86268,

2006-Ohio-4742, ¶ 11, quoting *State v. Dye*, 82 Ohio St.3d 323, 326, 695 N.E.2d 763 (July 8, 1998).

{¶ 42} It is well established that the elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence, on the other hand, is evidence that requires "the drawing of inferences that are reasonably permitted by the evidence." *Id. See also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.").

{¶ 43} Circumstantial and direct evidence are of equal evidentiary value. *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12. "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence." *Cassano* at ¶ 13, citing *State v. Treesh,* 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). In some cases, circumstantial evidence may be "'more certain, satisfying and persuasive than direct evidence.'" *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990), quoting

*Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 44} Weighing the evidence contained in the entire record and all reasonable inferences, considering the credibility of witnesses and determining whether in resolving conflicts in the evidence, we find that the judgment is not against the manifest weight of the evidence. We cannot say that "the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *State v. Bell*, 8th Dist. Cuyahoga No. 106842, 2019-Ohio-340, ¶ 41.

{¶ 45} The first assignment of error lacks merit.

**B. Reagan Tokes Law**

{¶ 46} Scott argues that the trial court erred in imposing a maximum sentence on the count of attempted rape in accordance with the Reagan Tokes Law. Scott argues that the law violates the federal and state constitutional right to trial by jury and the doctrine of separation-of-powers.

{¶ 47} However, we need not dwell on the arguments presented. The Ohio Supreme Court held in *State v. Maddox*, Slip Opinion No. 2022-Ohio-764, that constitutional challenges to the Reagan Tokes Act are ripe for review. Based on the authority established by this district's en banc holding in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), the challenges Scott advances against the constitutional validity of the Reagan Tokes Act have been overruled. *Id*. at ¶ 17-54.

{¶ 48} Scott's assigned error is overruled.

**{¶ 49}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, PRESIDING JUDGE

CORNELIUS J. O'SULLIVAN, JR., J., CONCURS;
KATHLEEN ANN KEOUGH, J., CONCURS IN JUDGMENT ONLY


N.B. Judge Anita Laster Mays is constrained to apply *Delvallie's* en banc decision. For a full explanation of her analysis, *see State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.). (Laster Mays, J., concurring in part and dissenting in part).