[Cite as *State v. Mann*, 2026-Ohio-2187.]

COURT OF APPEALS OF OHIO

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,            :

                                    No. 115649

    v.                             :

MICHAEL L. MANN,                        :

    Defendant-Appellant.           :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 11, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-25-701956-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Megan Helton, Assistant Prosecuting Attorney, *for appellee.*

P. Andrew Baker, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant Michael L. Mann ("Mann") appeals his convictions for sexually related offenses and the attendant sexually violent predator specifications. Finding no merit to the appeal, we affirm his convictions.

## I. Procedural History

{¶ 2} In May 2025, the State named Mann in an 18-count superseding indictment, charging him with sexually related offenses and specifications committed between May 2021 until October 2024, relative to six different victims.[1] The indictment stemmed from a pattern of activity by Mann during which he would recruit women through personal ads posted on websites to work serving drinks at alleged high-end poker events at prestigious hotels in downtown Cleveland, but ultimately lure them to another area of the city and sexually assault them, sometimes in broad daylight and other times under the cover of darkness.

{¶ 3} Regarding victim 1, the State charged Mann with rape (vaginal penetration), in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 1); and kidnapping, in violation of R.C. 2905.01(A)(4), a first-degree felony (Count 2). Both counts contained one- and three-year firearm specifications and a sexually violent predator specification.

{¶ 4} With regard to victim 2, the State charged Mann with rape (vaginal penetration), in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 3); rape (fellatio), in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 4); attempted rape (anal penetration), in violation of R.C. 2923.02 and 2907.02(A)(2), a second-degree felony (Count 5); gross sexual imposition, in violation of

---

[1] The State initially charged Mann for sexually related offenses that occurred in early 2023 relative to victim 2. While under that indictment and out on bond for those offenses, Mann committed subsequent offenses against victim 6. *See* Cuyahoga C.P. No. CR-23-687166-A.

R.C. 2907.05(A)(1) (Count 6), and kidnapping, in violation of R.C. 2905.01(A)(4), a first-degree felony (Count 7). Counts 3, 4, 6, and 7 contained a sexually violent predator specification, and Count 7 also contained a sexual motivation specification.

{¶ 5} Relative to victim 3, the State charged Mann with rape (vaginal penetration), in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 8); rape (fellatio), in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 9); and kidnapping, in violation of R.C. 2905.01(A)(4), a first-degree felony (Count 10). All counts contained a sexually violent predator specification, and Count 10 contained an additional sexual motivation specification.

{¶ 6} Pertaining to victim 4, the State charged Mann with rape (fellatio), in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 11); rape (vaginal penetration), in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 12); and kidnapping, in violation of R.C. 2905.01(A)(4), a first-degree felony (Count 13). All counts contained a sexually violent predator specification, and Count 13 contained an additional sexual motivation specification.

{¶ 7} Regarding victim 5, the State charged Mann with rape (vaginal penetration), in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 14); and kidnapping, in violation of R.C. 2905.01(A)(4), a first-degree felony (Count 15). Both counts contained one- and three-year firearm specifications and a sexually violent predator specification. Count 15 contained an additional sexual motivation specification.

{¶ 8} Relative to victim 6, the State charged Mann with rape (vaginal penetration), in violation of R.C. 2907.02(A)(2), a first-degree felony (Count 16); gross sexual imposition, in violation of R.C. 2907.05(A)(1), a fourth-degree felony (Count 17); and kidnapping, in violation of R.C. 2905.01(A)(4), a first-degree felony (Count 18). Counts 16 and 18 contained a sexually violent predator specification, and Count 18 contained an additional sexual motivation specification.

{¶ 9} Mann requested a jury trial on all charges and specifications, except for the sexually violent predator specifications, which were considered at a bench trial. Following the State's presentation of its case, the State dismissed Counts 14 and 15 because victim 5 did not appear at trial.

{¶ 10} The jury convicted Mann of the remaining charges and specifications except the firearm specifications attendant to Counts 1 and 2. Following a subsequent hearing on the sexually violent predator specifications, the court found Mann guilty on those specifications. The trial court ordered Mann to serve 132 years to life in prison.

## II. The Appeal

{¶ 11} This appeal follows, with Mann raising four assignments of error, which will be addressed out of order.

### A. Fair and Impartial Juror

{¶ 12} During voir dire, the trial court told the venire the charges against Mann. The court emphasized that the case "is going to be a hard case for everyone.

It can be a particularly hard case for some of you and we want to find that out." (Tr. 63.) The court indicated that it would ask each potential juror whether they were a victim of sexual assault or if someone close to them was a victim. "More importantly is there anyone hearing those charges that does not think they could serve as a fair and impartial juror?" (Tr. 63-64.) The court explained that a fair and impartial juror is one who serves without bias and does not prejudge the case. (Tr. 64.)

{¶ 13} After asking a few pointed questions to certain potential jurors, the court asked, "Let's have a show of hands how many people could not be a fair and impartial juror on this case for any reason whatsoever?" (Tr. 76.) The record reflects that six potential jurors raised their hands, including Juror No. 18. The following conversation subsequently occurred with Juror No. 18:

> THE COURT: You also indicated you couldn't be fair and impartial?
>
> JUROR NO. 18: Yes. I grew up in India with sisters and tons of cousins and uncles and we grew up in kind of anxious time and I also have two daughters. I'm kind of an emotional person, so I think with my heart and I feel like I would not do justice in being impartial and I would not be comfortable.
>
> THE COURT: Did something happen to your sisters and cousins?
>
> JUROR NO. 18: No, not really. The times we grew up, we were always — you know, my mother had her heart in the mouth if we were going out and all that kind of stuff.
>
> THE COURT: Okay. I understand it's a difficult case. It will be difficult testimony. You wouldn't be able to —

JUROR NO. 18: I don't think I would be strong enough with witnesses coming. I think I would be in distress listening to all that.

(Tr. 123-124.)

{¶ 14} The court continued asking Juror No. 18 general questions about her daughters and whether she had any connection to the justice system but nothing pertaining to bias or impartiality. Neither the court, the State, nor defense counsel asked Juror No. 18 any further questions during voir dire.

{¶ 15} At the conclusion of voir dire, Mann's counsel requested that in addition to three other jurors, Juror No. 18 be removed for cause. The State did not object to counsel's request on two of the other jurors — both of whom worked with victims of sexual assault. The State objected, however, to counsel's request to remove Juror No. 18 for cause, explaining that Juror No. 18 only stated that "she's an emotional person and doesn't know [if] she's strong enough to listen to this." (Tr. 229.) The State maintained that the juror's statements did not rise to the level of "for cause" — "I mean, hearing allegations of rape, we're going to elicit emotion in everyone and I think we both agree on that." *Id.*

{¶ 16} Defense counsel reminded the court that Juror No. 18 said she could not be impartial and further that the juror was not "rehabilitated to make her think she could be impartial." *Id.*

{¶ 17} The trial judge stated that when he asked Juror No. 18 why she could not be impartial, the juror responded, "because she's an emotional person." The court overruled counsel's request to remove Juror No. 18 for cause. The court also

overruled counsel's request to remove Juror No. 6 for cause, despite no objection by the State.

{¶ 18} Thereafter, each party exercised their peremptory challenges, each exhausting their allotted challenges. Defense counsel used one of his peremptory challenges to remove Juror No. 6, but did not use a peremptory to remove Juror No. 18. Accordingly, Juror No. 18 was sworn in and became a member of the jury panel.

{¶ 19} In his second assignment of error, Mann contends that the trial court abused its discretion in refusing to remove Juror No. 18 for cause. Specifically, Mann claims that the juror was never rehabilitated to ensure she could be fair and impartial or that she would follow the law as given.

{¶ 20} Pursuant to R.C. 2313.17(B)(9), a potential juror may be challenged for cause if "the person discloses by the person's answers that the person cannot be a fair and impartial juror or will not follow the law as given to the person by the court." R.C. 2313.17(C) provides that "[e]ach challenge listed in division (B) of this section shall be considered as a principal challenge, and its validity tried by the court." Similarly, Crim.R. 24(C)(9) provides that a person called as a juror may be challenged for cause when

> the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.

{¶ 21} Trial courts have broad discretion in determining a juror's ability to be fair and impartial, and reviewing courts will not disturb that determination absent an abuse of discretion. *State v. Smith*, 80 Ohio St.3d 89, 105 (1997). "Resolution of the impartiality issue rests in large part on the trial court's assessment of the juror's credibility and demeanor, and the context in which the issue arises." *State v. Lloyd*, 2021-Ohio-1808, ¶ 17 (8th Dist.), citing *Skilling v. United States*, 561 U.S. 358, 386 (2010); *State v. Williams*, 79 Ohio St.3d 1, 8 (1997); *see also Hinkle v. Cleveland Clinic Found.*, 2004-Ohio-6853 (8th Dist.). A prospective juror challenged for cause should be excused only if the trial court has any doubt as to the juror being entirely unbiased. *State v. Allard*, 75 Ohio St.3d 482, 495 (1996).

{¶ 22} Mann relies on *State v. Leavell*, 1989 Ohio App. LEXIS 1210 (2d Dist. Apr. 7, 1989), and *State v. Freshwater*, 2004-Ohio-384 (11th Dist.), to support his argument that when a potential juror states she cannot be fair and impartial, the juror must be removed for cause absent adequate rehabilitation.

{¶ 23} In *Leavell*, the prospective juror challenged for cause was asked whether he could give the defendant a fair trial and the juror twice answered that he did not think he could because the juror's wife worked in a similar-type business where the crime occurred. Despite these responses, the trial judge continued to ask the prospective juror to "think about it" and, after some deliberation, the juror responded that he "thought" he could be impartial. The *Leavell* Court found that

the juror should have been removed for cause due to the pressure exerted by the trial judge.

{¶ 24} In *Freshwater*, the prospective juror at issue expressed some doubt as to his ability to remain impartial but eventually stated that he would "try to be impartial." The Eleventh District found that the juror's words were "hardly the words of a juror confident in his ability to remain detached and able to render an unbiased verdict." *Freshwater* at ¶ 25. But more importantly, the court found an abuse of discretion for failing to excuse the juror for cause because the juror was a prosecutor who had a substantial relationship to the defendant's case — he was investigating the defendant's brother on a charge that was similar to the defendant's case and had spoken with the defendant prior to his own trial.

{¶ 25} Unlike the jurors in *Leavell,* 1989 Ohio App. LEXIS 1210 (2d Dist. Apr. 7, 1989), and *Freshwater*, 2004-Ohio-384 (11th Dist.), Juror No. 18 was not pressured to provide answers establishing her impartiality, nor was she closely affiliated with the facts or parties of the case. Accordingly, both *Leavell* and *Freshwater* are distinguishable.

{¶ 26} We recognize that the trial court did not ask Juror No. 18 any rehabilitative questions after the juror stated she could not be fair or impartial. But as the Supreme Court of Ohio has indicated, the trial court has the opportunity to observe the demeanor of the prospective juror and evaluate firsthand the sincerity of the responses to the questions and, thus, the trial court's position is of

considerable significance in the appellate review of its decision. *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990).[2]

{¶ 27} In this case, although the juror stated that she could not be fair or impartial, her justification was based on her comfort level and emotions because of the nature of the charges. Unlike some of the other jurors who were removed for cause, Juror No. 18 did not reveal or suggest that she was a victim of sexual assault, had family members who were victims of sexual assault, or was a person who worked with sexual-assault victims. Her answers were not based on any perceived bias toward Mann or sex offenders. Accordingly, we find that the trial court did not abuse its discretion in denying defense counsel's request to remove Juror No. 18 for cause. Mann's second assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 28} In his first and fourth assignments of error, Mann challenges the weight of the evidence regarding his convictions for the underlying offenses as well as the sexually violent predator specifications.

---

[2] The Ohio Supreme Court has been asked to revisit *Berk* and further clarify *Hall v. Banc One Mgmt. Corp.*, 2007-Ohio-4640, regarding principle challenges, and decide whether a prospective juror may be rehabilitated after that juror has disclosed that he or she cannot be a fair and impartial juror or will not follow the law as given by the court. *See 11/26/2024 Case Announcements*, 2024-Ohio-5529, *Estate of Price v. Kidney Care Specialists, L.L.C.*, No. 2024-1373 (appeals accepted for review). The Court heard arguments in *Price* in September 2025.

### 1. Standard of Review

{¶ 29} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. Weight is not a question of mathematics, but depends on its effect in inducing belief.'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 30} In a manifest-weight analysis, the reviewing court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 31} "'When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse a conviction where the trial court could reasonably conclude from substantial evidence that the state has proved the offense [or specification] beyond a reasonable doubt.'" *State v. Worship*, 2022-Ohio-52, ¶ 34 (12th Dist.), quoting *State v. Tranovich*, 2009-Ohio-2338, ¶ 7 (12th Dist.).

{¶ 32} Whether reviewing a conviction rendered after a jury trial or bench trial, it "should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which evidence weighs heavily against the

conviction.'" *Id.*, quoting *Thompkins* at 387; *see also State v. Brown*, 2025-Ohio-2804, ¶ 30-31 (reiterating the *Thompkins* manifest-weight standard of review).

## 2. Underlying Base Offenses Tried to a Jury

{¶ 33} Mann challenges his underlying convictions as against the weight of the evidence because the physical evidence regarding three of the victims was lacking and four of the victims failed to immediately report the sexual assaults. He thus maintains that because his convictions centered around the victims' credibility, when viewing the evidence and testimony of each victim, this is the exceptional case requiring reversal his of rape and kidnapping convictions. We disagree.

{¶ 34} At the outset, a rape conviction obtained without corroborative evidence does not necessarily render the conviction against the manifest weight of the evidence. *State v. Johnson*, 2025-Ohio-2770, ¶ 59 (8th Dist.), citing *State v. Wilk*, 2022-Ohio-1840, ¶ 63 (8th Dist.). It is well established that physical evidence is not required to support a conviction for rape. *State v. Hughes-Davis*, 2025-Ohio-3151, ¶ 27 (8th Dist.). *See generally State v. Scott*, 2022-Ohio-2768, ¶ 39 (8th Dist.). Accordingly, the fact that some of Mann's convictions were based solely on victim testimony and not on physical evidence does not render his convictions for those counts against the manifest weight of the evidence.

{¶ 35} Moreover, his convictions are not against the manifest weight of the evidence merely because certain victims delayed reporting the sexual assaults. The jury was entitled to consider the credibility of each victim's testimony and their

explanation for the delayed disclosure — reasons being embarrassment and guilt, having a warrant for their arrest, or simply that they believed it was their fault for placing themselves in the situation. Simply because certain victims did not immediately report the sexual abuse does not mean that their testimony was not credible. *See State v. Bones*, 2015-Ohio-784, ¶ 33-34, 40 (2d Dist.) (concluding that defendant's rape convictions were not against the manifest weight of the evidence even though victim did not report abuse until several years later). It is in the province of the jury to believe all, some, or none of the testimony of each witness testifying at trial. *State v. Guffie*, 2024-Ohio-2163, ¶ 77 (8th Dist.).

{¶ 36} Each victim offered testimony that established Mann's modus operandi and pattern of contacting women through personal ads that the women posted on various websites. His scheme spanned approximately four years. Mann's Google history corroborated his search activity on these websites during the relevant time period. The victims testified that he would contact them, asking if they would like to work a multiday, high-end poker game at a downtown Cleveland hotel and receive $2,000 in compensation, plus tips. He would tell the women that they were responsible for paying their hotel room deposit but the room would otherwise be covered. Mann instructed them to wear sexy clothing and to meet him at the specified hotel. Each victim testified that when they arrived at the hotel, he would either get in their car or have them get into his car, giving them the false impression that their hotel room "was not ready yet." What occurred after

Mann lured each victim from the hotel is discussed below (in the order in which they testified) relative to each victim.

### a. Victim 2 — February 14-15, 2023

{¶ 37} Victim 2 testified that after she gave him $250 for the hotel deposit, Mann told her that they upgraded her to a suite and that she had to pay a higher deposit. When she claimed she did not have the extra money, Mann stated that the owner of a local strip club located in the Flats — a downtown area along the banks of the Cuyahoga River — would cover the additional money. She drove them to the Flats, where Mann told her that the owner was not there nor was he answering his phone. The victim stated that Mann told her that he would cover the extra charge if "she would take care of him," which she interpreted as soliciting a sexual favor. She stated that they were in the Flats, an area unfamiliar to her because she lived in Canton, and no one was around. Moreover, she had a broken foot, which prevented her from fleeing from Mann. The victim testified that Mann forced her to perform fellatio and then he vaginally raped her. He attempted to anally rape her but, when she started "freaking out," he grabbed her breast and forced his hand over her mouth when she tried to scream. (Tr. 289.) After the rape, Mann directed her to drive back to the hotel and wait inside the hotel for the other girls, who were allegedly working the poker game. The victim stated that she entered the hotel, waited in the bathroom, and then went to the guest service's desk to inquire about the other girls and poker game. According to the victim, the guest services attendant looked at her "like she was bat shit crazy." (Tr. 293, 329.)

{¶ 38} Victim 2 drove herself home to Canton and immediately went to the hospital where a sexual-assault kit was performed. The victim testified that the police were initially skeptical of her report because she advertised and engaged in sex work and it took a detective ten days to contact her. Based on her reporting and cooperation, detectives began investigating Mann. Subsequent DNA testing confirmed the presence of Mann's DNA from the samples taken from the victim.

{¶ 39} Victim 2 identified Mann as the person who raped her. She denied consenting to any sexual activity with Mann or believing that she was being paid for sex work — she believed that she was being hired for nonsexual activity and to serve drinks at a high-end poker game at a downtown Cleveland hotel.

### b. Victim 1 — 2021

{¶ 40} Victim 1, who testified that she was currently living in the county jail, offered similar testimony as Victim 2. She stated that after she got into "the guy's" car, they drove to the Flats because he had "business to handle" at a strip club. (Tr. 387.) She stated that when they arrived in the Flats, it was still midday and daylight. He parked under an overpass and told her that he needed her "to get out [of the car] for a minute." (*Id.*) She stated that when she did, he grabbed her and vaginally raped her. Victim 1 stated she was scared and felt compelled to comply because she did not want to get hurt. According to the victim, "the guy" told her to "let me do it." (Tr. 390.) She stated that afterward, he drove her back to the hotel to work at the poker game. The victim stated that "the guy" took her $350 for the hotel deposit and he went inside the hotel. When he exited, he told her that he

paid for her room and to wait inside for his return.  According to the victim, he never returned and did not answer or return her phone calls.

{¶ 41} Victim 1 stated she felt devastated and that it was her fault because of her line of work but did not call the police or report the rape because she had a warrant for her arrest.  She stated that when she finally spoke to a detective in 2024, she showed him the May 2021 text message from "the guy" that was sent from a phone number that evidence and testimony established belonged to Mann.  Upon being presented with a photo array in 2024, the victim identified a person with 79 percent certainty as the person who raped her — the person was not Mann, although Mann's picture was in the array.  During her testimony, she admitted that she did not identify Mann in the array.  Furthermore, on cross-examination, she was unable to recall whether she told detectives if she considered Mann's conduct as "rape" because she was getting paid.  She clarified that she thought she was getting paid to serve drinks at a party — not have sex and that prior to meeting Mann, she never offered sex services.  Victim 1 denied consenting to sexual conduct with Mann that occurred on that midday afternoon.

### c.  Victim 3 — March 2023

{¶ 42} Victim 3 testified that she arrived at the hotel with an unexpected friend and, thus, Mann had her friend wait in the hotel for another woman to take her to a room to meet with someone about working the poker game.  Victim 3's experience was very similar to victim 2 where Mann told the victim that the hotel room was upgraded and she needed to pay extra for the deposit.  When the victim

did not have the extra money, much like in victim 2's situation, Mann stated he would "figure it out" and had the victim drive to a strip club in the Flats. Incidentally, the victim had worked at that club, so she did not find this or subsequent conversations about the owner of the club concerning. Once in the Flats, Mann touched her leg and then became increasingly aggressive when she rebuffed his advances. He opened her car door and forced her to perform fellatio and then vaginally raped her. Afterwards, she drove back up to the hotel and found her friend, who told her that no one ever came to get her for the poker game. Mann told the victim that he had to get "party favors" and then left. They then realized that there was no poker game and neither she nor her friend saw Mann again. But when the friend called Mann to demand their money back, he yelled at her and hung up.

{¶ 43} Although Mann does not raise any specific challenge to victim 3's testimony, we briefly note that the victim admitted that she did not report the rape out of fear because she had her own legal issues and she was using drugs. She further admitted that she was imprisoned for drugs but, upon her release, she spoke to detectives who were investigating Mann. Victim 3 stated that in 2024, she identified Mann with 90 percent certainty from a photo array and further identified Mann in court as the person who raped her in the Flats on that midday afternoon in March 2023. She unequivocally stated that she did not consent to any sexual conduct with Mann. Victim 3 testified that when she responded to his

message about working as a cocktail waitress at a high-end poker game, she told him she did not engage in sex for money.

### d. Victim 4 — April or May 2023

{¶ 44} Victim 4 testified that this was the first time she ever advertised on personal websites and that she did not advertise for sexual services, but only for dating because she was raising two children and needed money. Prior to meeting Mann, she video-chatted with him for self-assurance and because her family was in law enforcement. She agreed to work the poker game, but when she told Mann that she only had $50 for the hotel deposit, he told her she could pay him back after the event. She stated that she drove to the hotel, and Mann met her outside in his car. The victim parked her car in the valet area and got into his car because the hotel room "was not ready." She admitted to letting him grope her breast after he asked her if she was a cop.

{¶ 45} As they drove toward the Flats, she stated she started getting scared because she was a small woman in a stranger's car but stated everything sounded realistic because he was on his phone complaining to someone about the room not being ready. After a few minutes, the victim told him that her children's father frequented the area and they needed to leave. Mann then drove her farther away from downtown to a secluded warehouse area, driving toward the back of the lot by loading docks. When she asked Mann their whereabouts, he told her that he would cover her room deposit but she had to do "something" for him, asking for fellatio. (Tr. 502-503.) She repeatedly stated that she was not comfortable and,

out of self-preservation, asked him if they could just go to the hotel and "do whatever." (Tr. 503.) He said "no, doing it here" and unzipped his pants and exposed himself. *Id.* She stated she felt compelled to give him fellatio because she was scared that he would kill her. He assured her that after she performed fellatio, he would take her to the hotel for the party. Instead, he ordered her out of the car and vaginally raped her. Afterwards, Mann drove her back to her car at the hotel and told her to wait for a girl to show her where to park her car and that he was going inside the hotel to get her room ready. She stated she needed the money and thus naively waited for two hours in her car for someone to show — no one ever did and she never saw Mann again.

{¶ 46} Victim 4 stated that she never talked about the rape and did not report it because she was ashamed and embarrassed because her family was in law enforcement. But in 2024, when she saw a social media report, she recognized Mann's face immediately, called detectives, and 100 percent identified Mann as the person who raped her. She provided the detectives with the dress that she wore when Mann raped her. Although it had traces of seminal fluid, the DNA did not conclusively establish any connection to Mann. Victim 4 stated she did not consent to any sexual activity with Mann.

### e. Victim 6

{¶ 47} Victim 6 testified that she and her cousin agreed to meet with Mann in the late hours in October 2024 at a downtown hotel to work as servers and entertainers for a high-end poker game in downtown Cleveland. She testified that

he told her the hotel room deposit would be $300 per person. Victim 6 withdrew $300 cash, but her cousin only had $150. According to the victim, Mann called his friends to see if her cousin could make the extra money and, when his attempts were unsuccessful, he wanted the victim to go with him to the Flats to see if a strip club employee could help with the additional deposit. She stated that her cousin stayed at the casino while she drove Mann to the Flats. While she waited for Mann to figure out what to do, she and her cousin texted. In one text, victim 6 told her cousin that Mann propositioned her for sex to make the extra $150. The victim testified that she told Mann "no" and then became increasingly annoyed after he grabbed her breast and arm, questioning the legitimacy of the entire situation. She stated that she exited the car and, when she reached the front of her car, Mann grabbed and restrained her, ripped her underwear, and vaginally raped her.

{¶ 48} After the rape, she drove them back to the casino to pick up her cousin. She said that they then drove to the hotel for the poker game and Mann proceeded to go inside the hotel to check the girls into their hotel rooms. According to the victim, she told her cousin what happened in the Flats. Even though they questioned the legitimacy of the poker event, Mann became agitated at them, saying, "[W]ell, I don't need you all. You all need me." (Tr. 549.) The victim stated that due to her financial situation and Mann's assurances, they waited in the car for him to return. After they gave him $450 for the room deposit, they never saw Mann again and he stopped answering his phone.

{¶ 49} Victim 6 explained that she did not report the rape because getting the police involved was not "part of their community." After seeing a social media post with Mann's picture, she contacted detectives and reported that Mann had raped her in October 2024. Victim 6 stated that she did not consent to any sexual conduct with Mann; she expected to serve drinks and provide entertainment for money at a poker game.

{¶ 50} Based on the foregoing testimony offered by each victim and reviewing the entirety of the record, including any conflicts in the victims' testimony and the corresponding evidence, we find that Mann's convictions for rape, attempted rape, and gross sexual imposition are not against the weight of the evidence.

{¶ 51} Mann further argues that his kidnapping convictions are against the manifest weight of the evidence because (1) the victims voluntarily left with him from the hotel area, and (2) the State never established that Mann acted with deception because the State did not prove that the poker game or going to the Flats was just a ruse. We disagree.

{¶ 52} The weight of the evidence established that the victims arrived at the hotel under the false impression that they were being hired to work at a high-end poker game. Each victim testified that they left the hotel area with Mann under the false impression that the hotel room was not ready or because additional money was required. They also testified that once they arrived at a secluded location in either the Flats or a warehouse area, he raped them. Finally, each victim

testified that after returning to the hotel with Mann to work as hired, none of the victims were approached or contacted by anyone about working the poker game as Mann indicated would occur.

{¶ 53} Based on the foregoing, the weight of the evidence established that Mann acted with deception, satisfying the elements of kidnapping pursuant to R.C. 2905.01(A)(4). The victims' voluntary actions were motivated by false pretenses, and Mann's subsequent actions of leaving the area with the victims' money established that the high-end poker game was merely a ruse to lure the victims to the hotel.

{¶ 54} Accordingly, we find that Mann has not demonstrated that this is the exceptional case requiring this court to step in as the "thirteenth juror," reverse his convictions, and order a new trial. The trier of fact clearly did not lose its way or create such a manifest miscarriage of justice requiring reversal. Mann's fourth assignment of error is overruled.

### 3. Sexually Violent Predator Specification Tried to the Bench

{¶ 55} R.C. 2971.01(H)(1) defines a "sexually violent predator" as a "person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." In this case, Mann only challenges the finding he is "likely to engage in the future in one or more sexually violent offenses."

{¶ 56} R.C. 2971.01(H)(2) sets forth the factors to be considered when determining whether a defendant is a sexually violent predator:

(a) The person has been convicted two or more times, in separate criminal actions of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.

(b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.

(c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.

(d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.

(e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.

(f) Any other relevant evidence.

{¶ 57} There is no requirement that all these factors must be satisfied to find a person to be a sexually violent predator. *State v. Woods*, 2024-Ohio-954, ¶ 53 (8th Dist.), citing *State v. Sopko*, 2009-Ohio-140, ¶ 48 (8th Dist.), citing *State v. Williams*, 2001 Ohio App. LEXIS 4188, *14 (8th Dist. Sept. 20, 2001). "The statute specially notes that any of the factors may be considered as evidence that an individual is likely to engage in one or more sexually violent offenses." *Williams* at *id*. "At a bench trial, there is a presumption that the judge will have considered only relevant, material and competent evidence in reaching a verdict, unless the record affirmatively demonstrates otherwise." *State v. Bugg*, 2000 Ohio App. LEXIS 1839, *16 (8th Dist. Apr. 7, 2000), citing *State v. Post*, 32 Ohio St.3d 380, 384 (1987).

{¶ 58} Mann's sexually violent predator specification convictions are not against the weight of the evidence. From May 2021 until October 2024, he raped five women after luring them in a patterned, calculated scheme. The evidence demonstrated that he would hire the women under false pretenses, make them give him money that he then kept, kidnap them by taking the women to a secluded area of the city, and then sexually assault them. As the trial court found, Mann chronically committed these offenses with sexual motivation. Moreover, we note that Mann continued with his scheme and committed additional offenses while out on bond for offenses that occurred in 2023 relative to victim 2. Accordingly, the weight of the evidence established that Mann is "likely to engage in the future in one or more sexually violent offense." The trial court did not lose its way in finding Mann guilty of the sexual predator specifications. The first assignment of error is overruled.

## C. Merger of Rape and Kidnapping Offenses

{¶ 59} In his third assignment of error, Mann contends that the trial court failed to merge the rape and kidnapping convictions attendant to each victim. Specifically, he claims the following should have merged: Counts 1 and 2 (Victim 1); Count 7 should have merged with Counts 3, 4, or 5 (Victim 2); Count 10 should have merged with Count 8 or 9 (Victim 3); Count 13 should have merged with Counts 11 or 12 (Victim 4); and Counts 6 and 18 should have merged (Victim 6).

{¶ 60} Appellate courts review de novo whether two offenses are allied offenses of similar import. *State v. Boczek*, 2016-Ohio-5708, ¶ 4 (8th Dist.).

{¶ 61} The allied offenses statute, R.C. 2941.25, codifies Ohio's double jeopardy protections regarding when multiple punishments may be imposed. *State v. Ruff*, 2015-Ohio-995, ¶ 12. Under the statute, where the same conduct by a defendant can be construed to constitute two or more allied offenses of similar import, the indictment may contain counts for all such offenses, but the defendant may be convicted of only one offense. However, a defendant charged with multiple offenses may be convicted of all the offenses if (1) the defendant's conduct constitutes offenses of dissimilar import, i.e., each offense caused separate, identifiable harm; (2) the offenses were committed separately; or (3) the offenses were committed with separate animus or motivation. R.C. 2941.25(B); *Ruff* at paragraph three of the syllabus. Thus, to determine whether offenses are allied, this court must consider the defendant's conduct, the animus, and the import. *Id.* at paragraph one of the syllabus.

{¶ 62} In this case, the State maintained that notwithstanding the forcible restraint used to rape the victims, Mann committed the offense of kidnapping by deceptively luring each victim to a hotel under false pretenses then removed them to a secluded area for the purposes of engaging in nonconsensual sexual activity with each victim. Looking at the three *Ruff* factors, this court must consider whether the kidnapping and rape offenses: (1) caused separate identifiable harm, (2) were committed separately, and (3) were committed with separate animus or

motivation. An affirmative answer to any one of these enumerated considerations results in denial of merger. *Ruff* at ¶ 31.

{¶ 63} In determining whether a separate animus existed with respect to Mann's actions, we look at the guiding principles established in *State v. Logan*, 60 Ohio St.2d 126 (1979). *State v. Grate*, 2020-Ohio-5584, ¶ 107 ("Although *Logan* predates *Ruff*, the *Logan* guidelines are still relevant to determining whether rape and kidnapping convictions merge."). When "the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus to sustain separate convictions." *Logan* at syllabus. But when "the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions." *Id*. Similarly, when "the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions." *Id*.

{¶ 64} The Ohio Supreme Court has held that using deceit to lure a victim into danger may constitute a separate animus. *Grate* at ¶ 110 (holding that kidnapping by deception "was significantly independent from the asportation incidental to the rapes" where the perpetrator lured the victim into the house under the pretense of giving her clothes); *State v. Ware*, 63 Ohio St.2d 84, 87 (1980) (holding that the perpetrator's offer to let the victim use his telephone "was an act

of asportation by deception which constituted kidnapping, and which was significantly independent from the asportation incidental to the rape itself"). *See also In re X.F.*, 2025-Ohio-2730 (3d Dist.) (finding kidnapping and rape did not merge when juvenile knowingly created the false impression of a social gathering to lure the victim to his residence); *State v. Higgins*, 1985 Ohio App. LEXIS 6852 (10th Dist. July 11, 1985) (finding that the defendants' conduct in telling two girls that they would give them a ride to one of the defendant's homes, where they raped them, was kidnapping by deception that was separate from the subsequent kidnapping by force to facilitate the rapes); *State v. DePina*, 21 Ohio App.3d 91 (9th Dist. 1984) (finding asportation by deception was independent of asportation incidental to the rape when the defendant lured the victim out of a bar by deception, then forcibly removed her to a secluded area where he raped her).

{¶ 65} Relying on *Grate* and *Ware*, we find that the trial court did not err in denying merger of the rape and kidnapping offenses. Even though the kidnapping offenses were sexually motivated, the asportation of each victim subjected the victims to a substantial increase of harm separate from the subsequent rapes. Moreover, enticing the victims to either come to the hotel initially or by removing them from the hotel to a secluded area in the city was done under false pretenses and the movement of each victim was substantial and secretive, demonstrating an independent and separate animus for each offense. Accordingly, the kidnapping and rape offenses are not allied offense and thus did not merge. Mann's third assignment of error is overruled.

**{¶ 66}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

MICHELLE J. SHEEHAN, A.J., and
SEAN C. GALLAGHER, J., CONCUR